# DECISIONS

— OF THE —

# SUPREME COURT OF FLORIDA.

## JANUARY TERM, A. D. 1892.

TELFAIR STOCKTON, APPELLANT, VS. BENJAMIN R. POWELL ET AL., APPELLEES.

1. The purpose for which, under the act of June 11, 1891, entitled "An act to authorize Duval county to improve the navigation of the St. Johns river and to issue bonds in aid thereof," the proceeds of the bonds are authorized to be applied, is, "the work of improving the navigation of the St. Johns river, and removing obstructions therefrom, within the county of Duval." This work is a county purpose, within the meaning of the provisions of Section 5, Article IX of the Constitution, that the Legislature shall authorize the several counties to assess and impose taxes for county purposes, although the river is a navigable stream and public highway and may run, from its mouth in the county, and hundreds of miles beyond the limits of the county and through other counties, and commerce is carried on as an entirety upon it from its mouth towards its source for the distance stated, and thence back, and a large portion of its commerce is to or from other States and foreign countries, and the commerce and business of the river

confined within the limits of the county are very small and of
no importance. The statute is not in conflict with the con-
stitutional provisio i designated.

2. Commerce with foreign nations and among the States embraces
not only subjects which are national in their character and re-
quire, in ordir to preclude discriminating regulations by the
States, uniformity of regulation affecting all the States, but
also such matters within the purview of such commerce, as
are local in their nature or operation, and can be properly
regulated by provisions adapted to their particular circum-
stances. The power of Congress to regulate commerce with
foreign nations and among the States is exclusive only in so
far as it relates to those subjects of such commerce that fall
within the former or national class. As to this class the
States have no power to act even in the absence of congres-
sional regulation, but as to any subject within the other or
local class, the States have plenary power of control so long as
Congress does not act as to it. The improvement of a navi-
gable river connecting with the ocean and constituting a nav-
igable water of the United States, but lying entirely within a
State, is a subject falling within the second or local class, and
such improvement may be made by or under the authority of
the State so long as the free navigation of the river as it
may be permitted by the laws of the United States, is not im-
paired, or any system for its improvement provided by the
general government is not interfered with or defeated.

3. The act of June 11, 1891 (Chapter 4077 of the Statutes), author-
izing the county of Duval to improve the navigation of St.
Johns river and remove obstructions therefrom is not in con-
flict with the provision of the Constitution of the United
States which gives Congress power to regulate commerce with
foreign nations and among the several States.

4. If it be that the act of June 11, 1891, authorizing the county of
Duval to improve the navigation of the St. Johns river, and to
issue bonds, the proceeds of which are to be applied to such
purpose, does not provide any means or method for paying the

Telfair Stockton v. Benjamin R. Powell, et al.—Syllabus.

principle and interest on the bonds, such fact is not a goo1 objection to the validity of the act or to the issue of the bonds thereunder, nor is the fact that such provision may not be otherwise made.

5. The courts have no power to inquire whether the notice of application to the Legislature for local or special legislation, required by Section 21 of Article III of the Constitution and by the legislation thereunder defining the method of publishing and proving the publication of such notice (act of May 31, 1887, Chapter 3707 of the Statutes) has been given. To ascertain and decide whether the required notice has been given is exclusively a legislative function and duty, and the passage of a special or local act is a legislative ju·lgment that proper notice has been duly published and that the legal evidence thereof was "established in the Legislature" before the bill was passed, and the courts are concluded by such judgment.

6. A recital in the records of a special meeting of a Board of County Commissioners, that the meeting was " called by the chairman for the purpose of ordering an election" as to issuing bonds of the county under the provisions of a designated statute, is, in the absence of allegation and proof to the contrary, sufficient evidence that notice of the time and purpose of such special meeting was given to each member of the board.

7. A special meeting of a Board of County Commissioners, of which each Commissioner has been duly notified, may be adjourned to a subsequent day by the members present, a majority of the entire board ; and it seems that less than a majority may do so. The members present at such meeting have actual notice of the adjournment, and those not present are charged in law with notice thereof, and the adjourned meeting is but a continuation of the original one, and anything done at the adjourned meeting concerning the matter for which the meeting was originally called is as legal as if it had been done before the adjournment.

8. Where a regular meeting of a Board of County Commissioners adjourns to a subsequent day, all the members being present,

each member is charged with the official duty of attending,
and with notice of any lawful action to be taken at such adjourned meeting, and anything done at such meeting within
the power of the board to do, is not rendered invalid by the
fact that one member did not attend it.

9. A statute providing for an election as to the issue of bonds by a
county, directs that the returns of the election shall within
two days after the election be delivered to the Clerk of the
Circuit Court to be laid before the Board of County Commissioners, and that the board shall publicly canvass the returns at their "next regular or special meeting" and declare
the result : *Held*, That the purpose of the act in the use of the
words quoted was to secure promptness of action upon the
part of the board, rather than to exclude from any particular
meeting the power to canvass the returns, and that a canvass
of such returns made at an adjourned regular meeting held on
a day subsequent to the election, to which day the regular
meeting had been adjourned from a day prior to the election,
was legal.

10. Payment of poll taxes was not a requisite or qualification for voting at the election in Duval county as to issuing bonds under
the act of June 11th, 1891, for the improvement of the navigation of the St. Johns river. Though this is not expressly declared by the act, its provisions show clearly a legislative intent that no such qualification was to be required, but that all
persons duly registered as voters and retaining the qualifications which preserve the legality of registration should have
the right to vote.

11. The act of June 11th, 1891 , authorizing Duval county to improve
the navigation of the St. Johns river, required returns to be
sent to the Clerk of the Circuit Court, and to be delivered by
him to the County Commissioners, and authorized the Commissioners to canvass them. The County Judge and Supervisor of Registration had nothing to do with the canvass
under the general election law, and properly took no part
in it.

12. That a canvassing board has before it when making a canvass of votes cast at an election, not only the returns properly made under the statute, but also a duplicate return made to an officer which the law did not require to be made, is immaterial.

13. The mere fact that oaths of inspectors and poll lists may have been transmitted to an officer not authorized to receive them, is an irregularity which does not affect the result of an election or the legality of the canvass of returns duly made of votes cast at the election.

14. The act of June 11th, 1891, authorizing Duval county to improve the navigation of the St. Johns river, provides that the bonds to be issued under the act "sha 1 bear the seal of the aforesaid county of Duval." The County Commissioners passed a resolution that "the seal of the Circuit Court for Duval county, and of this Board now in use, is adopted as the common seal of Duval county:" *Held,* That the act authorized the use of the seal of the Circuit Court of Duval county in sealing the bonds, and to the extent that the resolution indicated the will of the board that it should be so used, the resolution was valid, but no further or otherwise.

Appeal from the Circuit Court for Duval county.

The facts of the case are stated in the opinion of the court.

*Cooper & Cooper* for Appellant.

This is a bill filed by complainant to enjoin the defendants as County Commissioners of Duval county from issuing $300,000.00 of bonds of that county under an act of the Legislature of the State of Florida, Chapter 4077, Laws of Florida, entitled "An Act to Authorize Duval County to improve the navigation of

the St. John's River and to issue bonds in aid thereof,"
approved June 11th, 1891.

The first ground urged in the bill why the bonds
should not be issued is that the purposes to which the
proceeds of sale of the bonds are to be applied, are
not "county purposes," and the legislation in effect
authorizes taxation for purposes not "county purpo-
ses," which is in violation of the Constitution of the
State of Florida and void.

No county or municipal corporation can lawfully im-
pose taxes for purposes not confined to its own limits,
and to objects not strictly confined to its own benefit
and that of its inhabitants. 2 Dillon's Mun. Cor.,
sec. 746; 102 U. S., 691; 96 U. S., 92; 111 U. S., 70;
64 Ill., 427 ; 114 Ill., 659; 110 Ill., 501.

The Constitution of the State of Florida enforces
this idea in Sec. 21, Article 111. "In all cases enu-
merated in the preceding section all laws shall be
general and of uniform operation throughout the State,
but in all cases not enumerated or excepted in that
section, the legislature may pass special or local laws ;
*Provided* That no local or special bill shall be passed,
unless notice of the intention to apply therefor shall
have been published in the locality where the matter
or things to be affected may be situated, which notice
shall state the substance of the contemplated law,
and shall be published at least sixty days prior to the
introduction into the legislature of such bill, and in
the manner to be provided by law. The evidence that

such notice has been published shall be established in the Legislature before such bill shall be passed."

The bill in this case alleges and the answer admits that the St. John's river is a navigable stream extending for two hundred miles and more beyond Duval county through several other counties, and that it is a navigable stream and most of the business and commerce over it, is to or from other counties, and the business and commerce on said river originating and terminating in said county is inconsiderable.

That the United States Government has and is exercising actual control of said river and making some improvements on same, and that any work carried on with the proceeds of the sale of these bonds must be under the supervision, direction and control of officers and agents of the general government.

It has been held that a county or city could not be taxed or bonded to aid a State school because it was not a purely local matter, although some indirect benefits might arise from the location of such school in such county or city.

Now in the case at bar the benefits to Duval county are only a part of the benefits to accrue from this work; under the facts set out in the bill the larger portion of the benefits will accrue to other counties along the river, and to other states or countries.

Mr. Dillon in his work on municipal corporations says that the mania to issue municipal and county bonds has become so great that they ought not to be

encouraged, and he admits with regret that they have any such power, hence the exercise of the power should be carefully guarded by the courts.   1 Dillon, sec. 508, 509.

Navigable streams are under the concurrent juris-diction and control of the general government, and where the general government has already assumed control of the navigable stream the state authorities cannot interfere but must either yield to the direction of the general government or release all effort at con-trolling the stream.   Cooley Con. Lim., 730.

Under the facts in this case, the general govern-ment is exercising actual control of the St. John's river and doing some work thereon, and it is alleged in the bill any work thereon by the county must be subject to the direction of the United States officials.

We submit the county should not be taxed to raise money to apply to purposes that it and its officers, agents and people cannot entirely direct, manage and control.

The second objection to this law and the issue of these bonds is that it provides for no sinking fund to pay the principal or means of paying the interest on the bonds.   How the bonds are to be paid, what an-nual rate of taxation is to be levied to meet these bonds is nowhere provided.   The payment of the bonds is left entirely to the general legislation for raising taxes for county purposes, and we submit none of the purposes for which counties are now authorized

to levy taxes covers such a subject as payment of these bonds. See Chapter 4012, Acts of 1891, sec. 2.

Again, where no rate of taxation or means of paying the bonds is mentioned in the act, subsequent Legislatures, proceeding only for ordinary indebtedness of all counties alike, might make the subjects for which counties might levy taxes and the rates they might levy such that the county of Duval could not meet the interest on the bonds or create any fund to pay the principal; in that event there would be an obligation on the county and no means to meet it, and a perpetual lien rests on the county and no means to cancel it.

Such legislation ought not to be permitted to be enforced if the court finds these effects would follow.

The third objection to this law and the issue of these bonds is that the act authorizing them is "local and special legislation" and the notice of introducing same into the Legislature required by the Constitution of the State of Florida was not given, and such notice was not "*established in the Legislature*" as required by the Constitution.

The notice given, copy of which is annexed to the bill provides that: "Application will be made to the Legislature of the State of Florida, &c., for passage of an act enabling the county of Duval to issue bonds, not *exceeding two hundred and fifty thousand dollars*, for purpose of deepening and otherwise improving the *channel* of the St. John's river and for other purposes," &c., copy of which is attached to the bill, but the act passed provides for issuing not exceeding

*three hundred thousand dollars* of bonds to be applied generally "to the work of improving the navigation of the St. John's river and removing obstructions therefrom within the county of Duval."

The notice does not state the substance. of this legislation as required by Sec. 21, Article III, of the Constitution of the State of Florida, and this act as passed differs from the legislation in two essential particulars, to-wit; the notice provides for $250,000.00 of bonds, the act for $300,000.00 the notice provides for using these bonds or their proceeds for purpose of *deepening and otherwise improving the channel of St. John's river*, &c. The act provides the proceeds of such bonds be applied to the work of generally improving the navigation of the St. John's river and removing obstructions therefrom within the county of Duval, not confining such improvement to deepening the *channel* of the river.

The purpose of this provision in the Constitution is undoubtedly to advise the people of the locality to be affected, what the legislation is, that will be sought to be passed, so affecting them and such locality.

Now is this purpose met, by giving notice that you will apply for an authority to issue bonds to the amount of $250,000.00 when in fact you apply for one-fifth as many more, to-wit: $300,000.00? It may be the people of the county would be willing to an issue of $250,000.00, and not of $300,000.00.

The amount of a special tax to be created or of a

lien to be fixed by law, is just such legislation as the people ought to have every exact notice concerning.

The difference in dollars and cents as to amount, where there is a difference, is not of such importance as the fact that there is a difference. Now a notice might provide that an act would be introduced in the Legislature for one dollar or ten dollars of tax or bonds and no one oppose it, but if the people of the locality knew a tax or lien of one thousand dollars or ten thousand dollars would be legislated, they would be present and actively oppose the legislation.

The notice in this case seemed to confine the purpose for which these bonds were to be used or the proceeds of same, was to *deepen the channel* of the St. John's river, while the act permits the proceeds of sale of said bonds to be applied to any improvement anywhere on the river in Duval county, and 'removing obstructions anywhere in said river in said county ; the people of the county might have been entirely satisfied with an act authorizing bonds to deepen the channel and to fix and bind the expenditures to that purpose where they would not be willing to let the trustees of said bonds have discretion to spend same on any *improvement* anywhere in the river in said county, that they deemed most advisable. Here then are two plain defects in the notice.

But it is contended by appellees that the court cannot investigate this notice or take proof as to what it

was, and that the Legislature only can judge of the sufficiency of that notice, and if they have passed an act they will be presumed to have had before them proof of proper notice.

Following this argument, if legislation local and special should be passed *without any previous notice* in violation of the Constitution the courts could not investigate same. We think the framers of this Constitution have provided against this argument and its result, in that the same requires that "the evidence that such notice has been published shall be *established* in the Legislature before such bill shall be passed." And this "*establishing*" proof of the notice, in the legislature is to make a *permanent record of the notice*, for future inspection and investigation.

This notice is jurisdictional, it is a condition precedent to exercising the legislative power, it is necessary to the due exercise of this power, and the records must show it.

It is admitted that where the constitution requires the number of votes for or against a law or measure to appear on the records of the legislature, and that a majority or a certain proportion of the vote is necessary to the passage of an act, then the courts may investigate the proceedings of the Legislature to ascercertain whether the law received the vote required or any other proceeding requisite in the legislature to the

lawful and regular passing of measures. Cooley Con. Lim., 163, 156, and Note, 25 ; 19 Ill., 324.

The bill in this cause alleges that no record of any notice of this legislation appears in the proceedings of the Legislature of 1891, no notice was at all *"established"* of this application for this legislation, the bill does not allege proof was made of the notice copy of which is annexed to the bill, but it was not "established" on the records of the Legislature in this particular, the requirements of the Constitution were not complied with in the matter of proving the said act authorizing the issue of these bonds.

The fourth ground mentioned in the bill of complaint is that the meetings of the defendants as County Commissioners, November 14th. 1891, and December 9th, 1891, were not "regular or special meetings" of the board, and that the action of the said defendants at their meeting of November 14th, 1891, calling the election to vote in said county on the issue of said bonds was unauthorized and void.

The copies of the proceedings of the defendants attached to the bill show that on November 12th, 1891, without any record or showing of a previous call of the board, the defendants Powell, Baer and DeCottes met in an alleged "called" meeting of the board, at which a petition of citizens was presented *asking* them to call this election ; they adjourned this called meeting to November 14th, 1891, but what notice of the call or

adjournment was given their record does not show; on November 14th, 1891, they met and issued the call for the election. The question here presented is, had these three Commissioners power to adjourn the alleged called meeting, and at the *adjourned* meeting to order this election ?

On December 2d, 1891, the defendants met at a *regular* meeting and adjourned to meet December 9th, 1891, at which last adjourned meeting when there were present Powell, DeCottes, Kelly and Pickett, and they canvassed and declared the result of the election and ordered the preparation of the bonds and authorized their issue, this last action was not taken at a "regular or special meeting" as required by this act, Chapter 4077, Section six (6), authorizing the holding of said election and issue of bonds in pursuance thereof.

The fifth objection to the issuing of these bonds is that Sec. 9 of the act requires that the bonds shall bear the seal of the county of Duval, and that the county of Duval had no seal, and that at the meeting of the defendants on December 9th, 1891, that it attempted to adopt the seal of the Circuit Court for Duval county, Florida, as the seal of Duval county, and intend to attach an impression of that seal to said bonds.

Sec. 7, page 932, McClellan's Digest, provides that the seal of the County Judge should be the seal of the county to be attached to warrants and bonds, as seal

of the clerk, and if any seal could be used upon these bonds it would be that of the County Judge, but no power exists in the defendants to adopt the seal of the Circuit Court for Duval county, Florida, to be attached to these bonds.

The 6th objection to validity of this election, to the issue of the bonds thereunder, and one of the most important objections raised by the appellant is the fact that out of the 2198 votes cast at said election, of which 1455 were cast for bonds, and 714 against bonds, and 21 not for bonds, and blank 8.

1722 persons voted who had not paid the capitation or poll tax for 1890, and 2132 voted who had not paid the poll or capitation tax for 1891. It thus appears that if the prepayment of the poll tax for 1890 and 1891 were prerequisites to voting at this election, that the election was not a legal one.

Whether prepayment of such poll tax is requisite to vote at such election depends upon the provisions of the act under which these bonds were to be issued; Chapter 4077 in connection with Chapter 3850 providing for the payment of capitation or poll tax as a prerequisite for voting.

Sec. 1 of Chapter 4077 authorizes the Board of County Commissioners to call an election "to be held by the *registered* voters of said county at which election said *registered* voters are authorized to vote," etc.

Section 3 provides that the election should be conducted and returns made in the manner prescribed by law for conducting elections, etc.

Section 4 provides for registering in the office of the supervisor, and that the supervisor should deliver and furnish a book for each election district containing the name of all persons registered in the district.

Section 5 provides "every person whose name shall appear in the registration books and every person holding a certificate showing that he is registered as a voter, and who has not lost the right to vote for any cause as provided by law, shall have the right to vote at such election."

Section 2 of Chapter 3850, provides that 30 days prior to any general, *special* or municipal election to be held in this state, the Collector of Revenue should furnish the Supervisor a list of all persons who had paid their capitation tax for two years next preceding the year in which any general, *special* or municipal election is to be held.

Section 3. The Supervisor shall note in the registration books the names of persons who have paid their poll tax "and only such persons shall be deemed qualified electors and authorized to vote at any general, *special* or municipal election."

Construing the provisions of these two acts together, is the prepayment of poll tax for 1890 and 1891

a prerequisite for voting at this election upon the issue of bonds under said Chapter 4077?

The general act as to the payment of poll tax, Chapter 3850, seems to require such prepayment before any such *special* election.   The bonding act, Chapter 4077, contemplates that the Supervisor of Registration shall furnish a list of qualified voters at this bonding election.   See sec. 4 of the act.

A part of the record of registration in the Supervisor's office is the noting on the registration lists of the names of persons who have paid their poll tax, and is thus made a part of registration.

Section 5 provides that every person whose name appears upon the registration books and every person holding a certificate showing that he is registered as a voter, and who has not lost the right to vote for any cause as provided by law, shall have the right to vote at this election.

Under these terms persons entitled to vote, their names must appear upon the registration books, and they must not have lost the right to vote from any cause, and if a person had paid the poll tax for 1889 and then had a right to vote but had not paid poll tax for 1890 or 1891, would he not be held to have lost the right to vote?

The provision that the names of the voters shall be taken from the registration lists, and the record of prepayment of poll tax being part of the record of regis-

2

tration, and the general act, Chapter 3850, for the prepayment of poll tax refering to special elections, and this section 5 of Chapter 4077, providing that no one shall vote who has lost the right to vote from any *cause*, we submit that the reasonable construction of the act is, voters for this election shall have the same qualifications as voters at any other special election.

Now if this contention is correct this election is void because more than three-fourths of the persons voting at the election had not paid the poll tax for 1890, and only 66 out of the total vote had paid the poll tax for 1891.

It may here be said however that this election only having been called on the 14th of November, and took place on the 2nd of December, that the 30 days before the election within which the Collector of Revenue should furnish to the Supervisor a list of those who had paid the poll tax for 1891 did not exist because there was not 30 days between the calling and the holding of the election, therefore the requisite of prepayment of poll tax for 1891 did not apply.

The 7th objection is that Section 3 of Chapter 4077 enacts that the election shall be conducted and returns made in the manner prescribed by law. This refers to the general election law, Chapter 3879. Section 30 of the last named act provides for returns being sent to the Supervisor of Registration and County Judge and the poll lists and oaths to the Supervisor of Registra-

tion.    Section 31 of the same act provides that the County Judge, Supervisor of Registration and a member of the Board of County Commissioners shall make a canvass and declare the result.

An apparent conflict with Section 3 of Chapter 4077. Section 6 of Chapter 4077 provides that the returns shall be made to the Clerk of the Circuit Court and that the Board of County Commissioners shall make a canvass and declare the result.

In this case the returns were sent to the Supervisor, County Judge and Clerk of the Circuit Court, and the returns sent to the Clerk of the Circuit Court were canvassed by the defendants as County Commissioners, and the poll lists and oaths of inspectors were sent with returns to the Supervisor of Registration.

It will appear that the inspectors in some particulars complied with both the general law and that of the act, Chapter 4077, but the act is contradictory and the question arises as to whether the canvass and declaration of the result was properly made by the County Commissioners, and whether it should not have been made under the general law by the Supervisor and County Judge and a member of the County Commissioners.

The foregoing is a brief statement of the reasons urged by appellant why issue of these bonds is not authorized by law, and in view of the large amount involved and the bonds creating a lien that will last for

many years, and the further fact that they will necessarily go into the hands of innocent persons who ought not after they have honestly paid their money for them be compelled hereafter to lose on account of illegality of the issue of the bonds, it is proper that they should be passed upon now by the highest court in the State, so that their validity or invalidity may be determined, and we submit the foregoing views for the consideration of the court.

*Randall & Foster* for Appellees.

The Legislature at its late session passed an act to authorize Duval county to issue its bonds for the purpose of raising means to pay the expense of removing obstructions from and improving the navigation of St. Johns river within the limits of Duval county. The act was approved June 11th, 1891, and is Chapter 4077, laws of 1891.

Appellant filed his bill to enjoin the issuing of bonds under that act. Defendants demurred.

1st. It is alleged in the bill that the St. Johns river is a navigable stream and public highway navigable for two hundred miles through the counties of Clay, St. Johns, Putnam, Orange and Volusia, the mouth of the river emptying into the Atlantic Ocean being in Duval county, and the argument of the bill is that the general control of the navigation of the river for the purposes of navigation and commerce is under the government of the United States. That the United States is now engaged in improving the navigation of the

river and doing a large amount of work, and that all such work must be done and controlled by the United States government.

Against this we cite Cooley's Const. Limitations, 5th edition, page 728 (marginal p. 589) to p. 731. Hasbrouck vs. City of Milwaukee 13 Wis., 37.

2nd. The second point made by the bill is that the act seeks to tax Duval county for "other than county purposes" and for the benefit of other counties, States and countries, and that the agents of the county can not control the expenditure of the money.

We believe it is well settled that the legislature has full power over the matter of taxation, and may authorize taxes to be levied for any purpose not expressly forbidden by the Constitution. That the legislature may authorize counties and municipal corporations to levy taxes for work of general utility of a public character has been affirmed in all the States, see Cooley's Const. Limitations, 142 (marginal p. 120, note 1) and pages 263–4; Cotten v. Comrs. Leon Co., 6th Fla., 610.

3rd. The third paragraph of the bill suggests that no sinking fund for the redemption of the bonds is provided for in the act.

This was not seriously mentioned in the argument in the Circuit Court and will not probably be urged here.

4th. The fourth and fifth paragraphs of the bill say the records of the legislative proceedings do not show that notice of the proposed legislation was pub-

lished or proved as required by Section 21, Art. 3, of the Constitution. And that the notice set out in the bill does not give the "substance" of the act as required by section 21, Art. 3, of the Constitution.

We submit that the printed notice shown by the bill does "state the substance" of the supposed act. And we insist that except where the Constitution expressly requires certain things to be shown by the journals, the Legislature shall not be presumed to have exceeded its constitutional power. Cooley's Const. Lim. (5th. ed.) 163, 164, 222, 223, and citations.

6th. The sixth paragraph of the bill seeks to show that all the members of the Board of County Commissioners were not present when the call for the election was issued.

The record shows that Commissioners Powell, Baer and DeCottes, were present at the first special meeting and that they adjourned to November 14th, at which time Baer only was absent. Baer had notice, however, because he was one who was present when they adjourned to the 14th.

7th. The seventh paragraph correctly shows the holding of the election pursuant to notice and the result of the vote.

8th. On December 2nd the board at its regular monthly meeting adjourned to December 9th, and did then canvass and declare the result of the election. This meeting being the regular or stated meeting as adjourned, was a continuation of the session, and no notice of it to members was necessary. (Dillon's Mun.

Corp. sec. 285). It was a regular meeting held next after the election, and the law was complied with.

9th. The ninth allegation of the bill raises no question.

10th. The tenth paragraph says that the county had no seal and there is no law authorizing the board to adopt a seal.

This question does not affect the substantial matter at issue. But we remark that sections 12 and 26 pp. 317, 319, McClellan's Dig. require the clerk as auditor of the board to "affix his seal of office" to certain papers in connection with the proceedings of the board. The auditor is the Clerk of the Circuit Court and his seal of office is the seal of the court. Any seal authoritatively affixed is a good seal. (1 Dillon, 3rd ed., secs. 190 and 534). We insist that the statute requiring the use of a seal impliedly authorized the board to adopt a seal.

12th. The twelfth paragraph raises the question as to the qualification of voters under the act of 1891, which authorizes the voting on the question of bonds. If the law requires that the prepayment of poll taxes is a necessary prerequisite to the right to vote on the question of issuing bonds under the act of 1891, then no valid election was held and a majority was not cast in favor of bonds; because only 426 persons who voted had paid the capitation tax assessed for 1890, and only 66 had paid for 1891.

If the prepayment of the capitation tax is not re-

quired by the act of 1891 to qualify voters on the subject of issuing bonds, then the election was rightly held.

The act of 1891 provides specifically that "every person whose name shall appear on the registration books and who has not lost the right to vote (for legal causes) shall have the right to vote at such election." It is contended by the appellant that the law relating to general and special elections controls the act of 1891. We take issue on this. A general election is held at specific periods for the periodical election of State and county officers. A special election is held for the purpose of filling vacancies in offices. (Chap. 3879 laws of 1889, page 88, *et seq.*)

The election held under the act of 1891 in question is neither a general or a special election within the meaning of the law. No officers are elected, nothing to be done except to get an expression of the people upon the question of aiding the improvement of St. Johns river by the issue of bonds. The Legislature had in view much more than mere political trickery in the enactment of this law. Voters in choosing officers must have paid (according to an act of doubtful validity) a capitation tax for the two successive years next preceding any general or special election (Chap. 3850 laws of 1889), and as the Constitution did not authorize the Legislature to impose the prerequisite of the payment of the capitation tax for two or ten or twenty years to entitle a man to be represented in the legislature or other office, so the requirement of such illegal

qualification for the right to vote would, in the case this act of 1891 had provided that none should vote unless they had paid several capitation taxes, have rendered the act invalid. The legislature intended that every man who had not disqualified himself by the commission of crime or removal from the county, and interested in taxation, might privately express his opinion on the subject of bonding the county. The payment of one poll tax for the preceding year might not have been objectionable, but more than this could not be valid legislation (Art. 6. sec. 8 Const).

Hence in the act of 1891, the law-makers ventured upon no such doubtful measure as to require the payment of several capitation taxes, but said that "every man registered as a voter and who had not forfeited his right to be a voter shall have the right to vote at such election." Had the legislature intended to place any other qualification to vote under this law upon the property owners of Duval county it would have said so, but having said that every qualified citizen not a criminal might vote shows that they intended no such registration.

The only reference in that act to the general election law is the third section, which relates only to the manner and form of conducting the election and making returns thereof. The act is a complete code in itself. It describes who may vote, in what manner they shall vote, where they may vote, who shall receive the ballots, when and to what officers the returns shall be made,

who shall canvass and declare and record the result of the vote. Clearly it avoids all reference to the election laws in these respects.

13th and 14th. These divisions of the bill are sufficiently met by what is said above, and we submit the case to the court.

Solicitors for respondents beg leave to refer the court to certain provisions of law with regard to the third paragraph of complainants' bill, which suggests that no provision is made in the act of 1891, Chapter 4077.

If the omission from the act of a provision for levying taxes to constitute a sinking fund for the redemption of the bonds, is deemed material in considering the validity of the act, we beg to suggest that such provision is not necessary in view of the law regulating the action of County Commissioners, (McClellan's Digest, 316 sec. 2 and sec. 36, page 18 Chapter 4010, acts of 1891), which authorizes the board to "determine the amount to be raised for all county purposes."

Now should the court determine that the act, Chapter 4077, is valid in that the improvement is a "county purpose," and the bond create a county-indebtedness, then under the said section 35 of the revenue law it is the duty of the County Board to levy a tax to meet the amounts coming due on the bonds, and any further direction to the board would be unnecessary.

The Legislature evidently passed this bonding act having in view the general legislation referred to, and did not deem it necessary to give a special direction to the County Board. If the object of the bonding act is a "county purpose," such special direction is no more necessary in this instance than it would be in the case of any other indebtedness, to-wit: for fees of offices and the like claims that should be paid by the county. It was deemed by the projectors of the measure that as the bonds had a long time to run, it would be unnecessary to begin to levy any tax for a sinking fund for some years from the present time, and so increase the tax levy at once. If the County Commissioners shall at some future time deem it best to impose a tax for creating a sinking fund they would doubtless apply to the legislature for the necessary power in order to gradually pay off portions of the bonds. While it is usual for a sinking fund to be provided for in acts of this kind, it is surely not necessary in the first instance in order to make the act valid.

RANEY, C. J. :

I. This is a suit for an injunction to restrain the appellees, who are the County Commissioners of Duval county, from issuing bonds under the provisions of an act approved June 11th, 1891, and entitled "An act to authorize Duval county to improve the navigation of St. Johns river, and to issue bonds in aid thereof,"

Chapter 4077, p. 119, Statutes of 1891. The purpose for which the proceeds of the bonds are authorized to be applied is, "the work of improving the navigation of the St. Johns river, and removing obstructions therefrom, within the county of Duval;" sec. 8, p. 121. The demurrer to the bill was sustained, and the complainant declining to amend, the bill was dismissed.

The first objection urged against the issue of the bonds is, that the purpose for which their proceeds are applicable under the statute, is not a "county purpose," within the meaning of our Constitution, and hence that the act is unconstitutional. Counties are, according to our Constitution, the recognized legal political divisions of the State ; sections 1 and 2, Article VIII ; and the same fundamental law, Section 5, Article IX, provides that "the Legislature shall authorize the several counties and incorporated cities or towns in the State to assess and impose taxes for county and municipal purposes, and for no other purpose.

If "improving the navigation of the St. Johns river, and removing obstructions therefrom, within the county of Duval," is not a county purpose in so far as Duval county is concerned, the act is contrary to the last stated provision of the Constitution, and void, and the bonds are of no validity ; and equity has jurisdiction to enjoin their issue. High on Injunctions, sec. 1282, *et seq.* ; Chestnutwood vs. Hood, 68 Ill., 132 ; List vs. City of Wheeling, 7 W. Va., 501 ; State vs. Salina

County Court, 51 Mo., 339 ; Allen vs. Inhabitants of Jay, 60 Me., 124.

The bill informs us that the river named is a navigable stream and public highway running not less than two hundred miles, beyond the limits of the county and through several other designated counties, and that commerce, travel and transportation are carried on as an entirety upon the stream from its mouth in Duval county, where it empties into the Atlantic Ocean, towards its source, and from its source to its mouth, at least the distance stated, and through each and all of such counties ; and that a large portion of this commerce is to or from other States and foreign countries, and that the commerce and business on the river confined within the limits of Duval county is very small and of no importance.   The other averments of the bill are numerous and will be noticed, but these give us an understanding of the character of the stream intended to be improved.   It is not exclusively local either in its being or its use ; but runs through Duval, and through or between several counties, and is the highway of their local as well as their other commerce, including interstate and foreign commerce.

The authorities have formulated no generally accepted definition of a "county purpose," but leave each case involving the question to be decided as it may arise.   In the case of Cotten *et al.* vs. County Commissioners of Leon County, 6 Fla., 610, where the 4th sec-

tion of Article VIII of the Constitution then under
consideration was substantially like the 5th section of
Article IX, *supra*, of the present organic law, it was
contended by the appellants that locality within the
county was the true test of a work being one that is
included within "county purposes," while the position
of the Commissioners was that anticipated *benefits* from
the work was the proper criterion. The answer of the
court to these contentions was: that neither, taken by
itself, "will furnish the correct rule, but as a general
rule it requires a concurrence of both, for it will read-
ily strike the mind of every one that a great enterprise
may be embraced entirely within the limits of a county,
and therefore exclusively local without in the slight-
est degree being entitled to the distinctive character of
a county purpose. While on the other hand another
enterprise, though entirely without the county limits,
may confer innumerable *benefits* upon and advance the
best interests of the county with as little claim to the
character of a county enterprise." These observations
are followed immediately by the further remark that
it would be as improbable as it is dangerous to attempt
to prescribe any definite rule to be looked to as furn-
ing any correct test on the subject; pp. 623-4.

If it be that locality within the county is essential to
render an improvement a "county purpose," it is clear
that the work contemplated by this statute furnishes a
compliance with this requirement, for under the act

nothing is to be done outside of the county ; and this being so it becomes, for all the purposes of this case, immaterial whether or not the absence of the feature, locality within the county, will always avoid as unconstitutional any legislation providing for public improvements or works through the instrumentality of a county government and county taxation, and consequently nothing should or will be said on that point.

It is not denied that an improvement must, to fall within the pale of " county purposes," be one for a public purpose, as taxation cannot be resorted to for private purposes, or for the benefit, aid and promotion of private enterprises. This principle has never been questioned, but there has been and always will be more or less difficulty and conflict of opinion as to whether particular projects were or are for a public or a private purpose. In many cases the aid authorized to be given by counties in the construction of railroads was in the shape of subscription for capital stock of, or of donations to the companies proposing to build the roads, and such subscriptions and donations were upheld almost invariably ; Cotten vs. County Commissioners, *supra;* King vs. Commissioners of Columbia County, 12 Fla., 451 ; but with us it is assumed that this form of promoting the construction of highways has been inhibited by a constitutional provision, ordaining that "no tax shall be levied for the benefit of any chartered company of the State, nor for paying interest on any

bonds issued by such chartered companies, or by counties, or by corporations, for the above mentioned purpose;" Section 7, Article IX. There is, however, no feature here of aid, even in form, to any incorporated or other company, nor does the statute propose any benefit to any private purpose, or private enterprise. The work is to be carried on under the direction and control of the public agencies named in the act, and no individual, natural or artificial, nor any company, incorporated or unincorporated, is the special object of the benefaction of the improvement contemplated, but it, on the contrary, is for the public without discrimination. The use of the river, when improved as contemplated by the statute, is not to be appropriated, either directly or indirectly, to or for the benefit of any one person as against another.

It was said in Cotten vs. County Commissioners, *supra*, that to obtain a correct interpretation of the term "county purposes," as used in the Constitution then in force, which Constitution was framed in 1838-9, we must look to cotemporaneous legislation on that subject and the uniform action of the County Courts under the Territorial Government, and that by making this reference it will be abundantly demonstrated that at that day county purposes were taken to embrace principally the erection and repair of court houses and jails, the opening and maintaining public thoroughfares within the limits of their respective counties, by opening roads, building bridges and causeways, and keeping the same in repair, licensing and regulating

ferries and toll bridges.   In somewhat the same strain
Judge Cooley, in treating of what constitute public
purposes for which taxation may be laid, says in his
work on taxation (2d ed.), p. 116, that in deciding
whether in a given case the object for which the taxes
are assessed is public or private, the courts must be
governed mainly by the course and usage of the gov-
ernment, the objects for which taxes have been cus-
tomarily and by long course of legislation levied, what
objects or purposes have been considered necessary to
the support, and for the proper use of the
government, whether State or municipal; that what-
ever lawfully pertains to this and is sanctioned by time
and the acquiescence of the people may well be held to
belong to the public use, and proper for the mainten-
ance of good government, though this may not be the
only criterion of rightful taxation.   And on a subse-
quent page (130) of the same chapter, he observes that
one of the most important functions of government is
making provision for public roads for the use of the
people, the variety of which is great and the mode of
construction and operation difficult.   No question, he
asserts, is made of the competency of the Legislature
to levy taxes for the common highway, the improved
turnpike and macadamized road, the planked or paved
street, the canal, the tramway, or the railway, any or
all of which may be constructed by the State, or under
State authority by the municipal subdivisions of the
State within whose limits they may be needed.   Again,
in Commissioners of Hamilton County vs. Mighels, 7

Ohio St., 109, a case characterized by Judge Dillon
(sec. 23 Dillon on Municipal Corporations) as one in
which the distinction between cities and towns, or mu-
nicipal corporations proper, and *involuntary quasi*
corporations, such as counties, is very clearly drawn,
"the means of travel and transport" are designated
among the purposes for which county organizations
are created. Further, it is said in Nicol vs. Mayor and
Aldermen of Nashville, 9 Humph., 252, of "corpora-
tion purposes," as applicable to a city, that they in-
clude "all facilities of canals, roads, the improvement
of rivers by which their navigable use is extended, by
all which the commercial interests of a town are in-
creased and expanded by reason of the increased facil-
ities of communication thus furnished, by means of
which the wealth of its population individually and
collectively is increased, with a consequent increase of
the comforts and enjoyments of life ;" but however,
with the qualifying remark that these improvements
must have some connection with the corporate town
claiming them as corporate purposes more direct than
that which would result from the general increased
prosperity of the country by reason of such improve-
ments made without a direct reference to, or indirect
connection with the town; and that the improvement
must have such relation to the town as to be the me-
dium through which this prosperity is attained, and
must begin or terminate at the town, or pass through,
or so near to it as to be capable of affecting its direct
interests.

Even if we were without more direct authority upon the question, it would seem difficult to hold that the improvement of the St. Johns river within the limits of Duval county is not a county purpose. The river is a highway, a means of travel and transport useful to the local interests of the people of the county, and to our minds clearly within the local purpose for which, counties and their governments are created. That the commerce and business on the river local to the county is small, or, in our judgment, of "no importance," does not change the character of the river or its improvement as a county purpose, nor affect the power of the legislature to authorize the improvement, or of the county authorities to make it in the manner prescribed. The function of the judiciary is to confine the Legislature and the county authorities to the limits prescribed by the Constitution, and not to control the exercise of any discretion that may be within such limits. That we might think the establishment of an ordinary road, or the widening or other improvement of an old one, or other exercise of firmly established instances of power entirely unnecessary, or the improvement now in question unadvisable, can not justify a usurpation upon our part of legislative or executive functions; and the same principle must control our action when we are urged to interfere on the ground that the subject of the improvement, or its result, may be of greater benefit to foreign interests than to those local to the county. That a river may be used more for intercourse and commerce between counties, or even States, than

for that which appertains simply to the county pro-
posing to improve it, and that its improvement will re-
dound in a greater degree to the benefit of those en-
gaged in such foreign transportation and traffic, is no
stronger argument against the improvement of the
river within the county than it would be to urge as a
reason for not making or improving an ordinary road,
that the travel and carriage upon it affecting interests
beyond the county or by persons not resident in the
county, would be more extensive than the local travel
or carriage.

Still we are not without more direct adjudication
upon the part of this improvement being a county pur-
pose. The effect of the decision in Hasbrouck vs.
City of Milwaukee, 13 Wis., 37, is, that a Legislature
may authorize a city to issue bonds for the construc-
tion of a harbor, but that the construction of railroads,
canals, harbors and the like internal improvements can
not be done by a municipality without a specific grant
of the power by the Legislature. In Taylor vs. Com-
missioners of Newberne, 2 Jones (Eq.), 141, an act au-
thorizing the commissioners of an incorporated town
to subscribe to the stock of a company incorporated for
the purpose of improving the navigation of a river con-
tiguous to the town, was held constitutional, although
the improvement contemplated by the act was to begin
several miles above the town and to pass through sev-
eral other counties than the one in which the town was
situated. Goddin vs. Crump, 8 Leigh, 120, is a case
in which legislation authorizing the city of Richmond

to subscribe for stock in a company incorporated for the purpose of connecting the navigable waters of the James river with those of the Ohio river, and providing for taxation to pay for the principal and interest of money borrowed to pay for such stock, was held constitutional as being a corporate purpose. Among other observations of the opinion, it is said that the removal of the bar in James river above Warwick would be fairly a corporate act since it would greatly redound to the advantage of Richmond, would benefit its trade, and diminish the charges which now encumber and embarrass it; for though the work would be done beyond the limits of the city, the consequence or effects of it would be felt throughout its borders.

We fail to find in the authorities cited by appellant's counsel anything inconsistent with the above conclusions. They will be noticed in the succeeding paragraph.

County of Mobile vs. Kimball, 102 U. S., 691, is a case in which a statute of Alabama authorized the issue of bonds of the county of Mobile by its proper authorities, to be used by a designated board under authority granted them, in the improvement, cleaning out, deepening and widening of the river, harbor and bay of Mobile or any part thereof, or the making an artificial harbor. This board entered into a contract with Kimball and another for dredging a channel through Dog river bar in Mobile bay, and the work was completed in March, 1873. Two of the contentions of appellant were, 1st, that the statute was invalid as

being in conflict with the commercial power vested in
Congress ; 2nd, that the expense of the work could not,
under the constitution of Alabama, be *imposed* on the
county of Mobile, the work being for the benefit of the
whole State.    The views of the court as to the former
of these objections are pertinent to the second subdi-
vision of this opinion, and will be noticed in it.    The
conclusion reached as to the second objection was
against it ; and having previously observed that the
issue of the bonds was the loan of the credit of the
county for a work, public in its character, designed to
be of public benefit to the State, but more especially
and immediately to the county, (see also President, &c.,
vs. State *ex rel.*, 44 Ala., 399,) yet it was held assuming as
true the contention that the act fastened upon one county
the expense of an improvement for the whole State,
that when any public work is authorized, it rests with
the Legislature, unless restrained by constitutional
provisions, to determine in what manner the means to
defray its cost shall be raised, and that it may appor-
tion the burden ratably among all the counties or other
particular subdivisions of the State, or lay the greater
share, or the whole, upon that county or portion of the
State specially and immediately benefited by the ex-
penditure, and, that any injustice or oppression in the
imposition of the expense on less than the whole State
was remediable not at the bar of the courts, but at the
polls.    In Davidson vs. New Orleans, 96 U. S., 107, an
assessment of real estate in New Orleans for draining
the swamps of that city was resisted on the ground
that the proceeding deprived the owner of his property

without due process of law. The court, while it avoided the danger of attempting a definition of due process of law, held that there is due process of law when the statute requires that such a burden or the fixing of a tax or assessment before it becomes effectual, must be submitted to a court of justice with notice to the owners of the property, all of whom have the right to appear and contest the assessment. Hagar vs. Reclamation District No. 108, 111 U. S., 701, decides nothing for which notice can be taken of it here, but that it is within the discretion of the Legislature of California to prescribe a system for reclaiming swamp lands, when essential to the health and prosperity of the community, and to lay the burden of doing it upon the districts and persons benefited. In the case of Board of Supervisors of Livingston County vs. Weider, 64 Ill., 427, the Constitution provided that the corporate authorities of counties, cities and towns, and other local subdivisions, naming them, might be vested with power to assess and collect taxes for corporate purposes, and it was held that, to come within the meaning of this provision, a tax for corporate purposes must be for such purposes and such only as are germane to the objects of the creation of the municipality, and at least such as have a legitimate connection with those objects and a manifest relation thereto, and that a location or site for a *State* institution provided for by law—a State Reform School for juvenile offenders and vagrants—in a certain township of a county, was not a county purpose justifying the issue of bonds of the county to provide such a site, and that a statute

authorizing such issue of bonds was unconstitutional. Mather vs. City of Ottawa, 114 Ill., 659, decides that under the same constitutional provision a municipal corporation is prohibited from levying a tax in aid of a merely private enterprise, although the purpose may be one that will add to the wealth and prosperity of the municipality. Bonds of the city were issued under an ordinance approved by a vote of the people authorizing the Mayor to borrow a large sum "for the use of the said city to be expended in developing the natural advantages of the city for manufacturing purposes," and providing for the issue of bonds for the same. The bonds were given to an agent of a private corporation to be by him expended in the improvement of the water power upon certain rivers within the city, and he negotiated them to a person residing in the city, and it was held that the bonds were void, not being issued for a corporate purpose. The decision in Board of Supervisors of Will County vs. People *ex rel.*, 110 Ill., 511, is in effect, as is stated in Cooley on Taxation, p. 130, note, that a State may by general law or otherwise require a county to share with a town in the cost of an expensive bridge or road, though in general the towns bear the whole cost of such works. The question was as to the constitutionality of a statute which provided that in certain cases a county should pay half the expense of the construction of a bridge in a town, or between two towns, which the town authorities might desire to build, the town authorities to furnish the other half. The constitutional provisions invoked were, 1st, that the general

assembly might "vest the corporate authorities of cities, towns and villages with power to make local improvements by special assessments or by special taxation of contiguous property or otherwise," and that "for all other corporate purposes all municipal corporations may be vested with authority to assess and collect taxes," the same "to be uniform in respect to persons and property within the jurisdiction of the body imposing the same." 2d. "That the general assembly should not impose taxes upon municipal corporations, or the inhabitants or property thereof, for corporate purposes, but shall require that all the taxable property within the limits of such corporations shall be taxed for the payment of debts contracted under authority of law," the same to be "uniform," as stated above. The reasons assigned why the statute conflicted with the above provisions of the organic law were that it attempted to confer discretionary power of local taxation upon persons other than the corporate authorities of the district to be taxed, and authorized the levy of a tax for township purposes on property not subject to the jurisdiction of the authority not levying the tax, that the Legislature could not impose a debt upon a municipal corporation without its assent. The statute and tax were sustained, and while the conclusion of the opinion is that taxation, in pursuance of a general law of the State, for the purpose of building bridges, maintaining public highways, and similar objects in which the people of the State are directly interested, is not taxation for a strictly local purpose within the meaning of the fundamental law

set out, and that municipal authorities in levying taxes for such purposes, as distinguished from the mere private concerns of a municipality, are in a large sense merely agencies of the State in carrying into effect general laws enacted for the common good; it is also the conclusion and judgment of the court that the expense of such bridges and highways could be imposed on the county as had been done in that case. The other authority referred to by appellant is section 746 of Dillon on Municipal Corporations, stating the provisions of the Illinois Constitution, to the effect that "the corporate authorities of  *  *  cities  *  *  may be vested with power to assess and collect taxes for corporate purposes," and that the Supreme Court of that State had held that the provision limited taxation by municipal authorities to local or corporate purposes, and restrained the Legislature from granting the right of local or corporate taxation to other than the corporate authorities of the municipality or place to be taxed.

No comment on these cases seems to us necessary to show that they do not conflict with our conclusion that the improvement proposed by the act under consideration is a "county purpose," and the statute valid against the objection we have been considering.

II. It is also alleged in the bill that the general control of the river for purposes of navigation and commerce is under the general government of the United States, which has had the same surveyed, and lights and light-houses, buoys and channel marks placed in

and along said river, and has done; and is now engaged in a large amount of public improvement in said river, both at its mouth and at different points beyond the limits of Duval county towards the source of said river, placing jetties therein, and in other respects endeavoring to improve the navigation of the river and to remove obstructions therefrom.

This part of the bill might be treated as abandoned by the appellants, as it is not legimately within any discussion to be found in their brief. We, however, are not satisfied to permit the point to pass unnoticed, for if the statute constitutes, in view of these allegations, or for other apparent cause, an interference with the works or jurisdiction and policy of the general government, we ought to arrest promptly any attempt at its enforcement, and not leave this to be done in the courts of the United States, as it might be, at the instance of proper suitors in that forum. The obligation rests no less upon us than it would on a national tribunal having jurisdiction in the premises.

In County of Mobile vs. Kimball, 102 U. S., 691, cited *supra*, while it is held that the power conferred on Congress by the commercial clause of the Constitution—that giving power to regulate commerce with foreign nations and among the several States—is exclusive so far as it relates to matters within its purview which are national in their character, and admit or require uniformity in any legislation affecting all the States, and that commerce with foreign countries and among the States, strictly considered, consists in inter-

course and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale and exchange of commodities, and that to regulate commerce, as thus defined, there must, to secure against discriminating State legislation, be only one system of rules applicable alike to the whole country and prescribable only by Congress ; yet, it is also decided that State legislation is not forbidden touching matters either local in their nature or operative or intended to be mere aids to commerce, and for which special regulation can more effectually provide. "The improvement of harbors, bays and navigable streams within the State," says the opinion, "falls within this last category of cases. The control of Congress over them is to insure freedom in their navigation so far as that is essential to the exercise of its commercial power. Such freedom is not encroached upon by the removal of obstructions to their navigability or by other legitimate improvement. The States have as full control over their purely internal commerce as Congress has over commerce among the several States and with foreign nations, and to promote the growth of that internal commerce and insure its safety they have an undoubted right to remove obstructions from their harbors and rivers, deepen their channels and improve them generally, if they do not impair their free navigation as permitted under the laws of the United States or defeat any system for their improvement provided by the general government." The statute was held not to be in conflict with the Constitution of the United States. The decision in

Escanaba Company vs. Chicago, 107 U. S., 678, was
that the Chicago river and its branches, although lying
within the limits of the State of Illinois, are navigable
waters of the United States over which Congress in the
exercise of its power under the commercial clause of
the Constitution, *may* exercise control to the extent
necessary to protect, preserve and impose their free nav-
igation ; but until that body acts the State has plenary
authority over bridges across them, and may vest in
the city of Chicago jurisdiction over the construction,
repair and use of those bridges within the city ; and
further, that there was nothing in the "ordinance of
1787," or the subsequent legislation of Congress pre-
cluding the exercise of such power by the State.   The
cases of Wilson vs. Blackbird Creek Marsh Co., 2 Pe-
ters, 245 ; Gilman vs. Philadelphia, 3 Wall., 713 ;
Pound vs. Turk, 95 U. S., 459 ; Carswell vs. Bridge
Company, 113 U. S., 205 ; Hamilton vs. Vicksburg,
&c., R. R. Co., 119 U. S., 280, and Williamette Iron
Bridge Co. vs. Hatch, 125 U. S., 1, are illustrations of
the plenary power of a State, in the absence of and
until Congress acts on the same subject, to authorize
the construction of bridges and dams, over and in navi-
gable rivers lying entirely within its borders, and the
consequent obstruction of such streams.   The case of
Huse vs. Glover, 119 U. S., 543, is, however, like that
of Mobile County vs. Kimball, one involving the fea-
ture of an improvement of navigable waters under
State authority.   The Legislature of Illinois adopted
measures for improving the navigation of the Illinois
river, including the construction of a lock and dam at

46 SUPREME COURT.

Telfair Stockton v. Benjamin R. Powell, et al.—Opinion of Court.

two points on the river. The works were constructed at large expense principally borne by the State, it being represented that a small portion was contributed by the United States, and tolls were prescribed under the State legislation for the passage of vessels through the locks. The complainants owned steamboats and barges engaged in interstate commerce, which had to pass through such locks, and alleged that prior to the construction of one of the dams they were able to navigate the river without interruption except such as was incident to its ordinary use in its natural state, and that the dams were an impediment to the free navigation of the river, and wholly impeded, except at extreme high water, the navigation of the river by steamboats and other vessels which were previously accustomed to navigate it, unless they passed through the locks, and stating the amount they had paid as tolls imposed upon the cargoes of ice, and for the passage of their boats and barges, through the locks. The toll charges were sustained. In the opinion it is said: "The exaction of tolls for passage through the locks is as compensation for the use of artificial facilities constructed, not as an impost upon the navigation of the stream. * * For outlays caused by such works the State may exact reasonable tolls. They are like charges for the use of wharfs and locks constructed to facilitate the landing of persons and freight, and the taking them on board, or for the repair of vessels. The State is interested in the domestic as well as in the inter-state and foreign commerce conducted on the Illinois river, and to increase its facilities, and thus

augment its growth, it has full power.   It is only when, in the judgment of Congress, its action is deemed to encroach upon the navigation of the river as a means of inter-state and foreign commerce, that that body may interfere and control or supersede it.   If, in the opinion of the State, greater benefit would result to her commerce by the improvements made, than by leaving the river in its natural state—and on that point the State must necessarily determine for itself—it may authorize them, although increased inconvenience and expense may thereby result to the business of individuals.''

Answering the suggestion that appropriations by Congress had been expended in improving the Chicago river, it is said in Escanaba Co. vs. Chicago, *supra*, that no money had been expended above the bridge objected to in that suit, which bridge was erected and regulated by the city under State legislation, and that consequently no bridge interfered with the navigation of any portion of the river which had thus been improved, but that if it were otherwise it was not perceived how the improvement could affect the ordinary means of crossing it by ferries and bridges; that "to render the action of the State invalid in constructing or authorizing the construction of bridges over one of its navigable streams the general government must directly interfere so as to supersede its authority and annul what it has done in the matter.''   In Willamette Iron Bridge Co. vs. Hatch, *supra*, another case of a bridge authorized by State legislation, it is held that

there must be a direct statute of the United States in order to bring within the scope of its laws obstructions and nuisances in navigable streams within a State, they being offenses against the laws of the State within which the navigable waters lie, but, in the absence of a federal statute, not an offense against the United States. That until Congress acts respecting a navigable stream entirely within a State the State has plenary power, yet Congress is not concluded by anything that the State, or individuals by its authority or acquiescence, may have done, from assuming entire control and abating any erections that may have been made, and preventing any other from being made except in conformity with such regulations as it may impose. The fact of the appropriation by Congress of money to be expended in the improvement of the river, and that of making of the city, where the bridge was, a port of entry, were urged by counsel as objections to the authority of the State and the validity of its legislation, and were disposed of thus by the court: The argument of the appellees, that Congress must be deemed to have assumed police power over the Willamette river in consequence of having expended money in improving its navigation, and of having made Portland a port of entry, is not well founded. Such acts are not sufficient to establish the police power of the United States over the navigable streams to which they relate. Of course any interference with the operations, constructions or improvements made by the general

government, or any violation of a port law enacted by Congress would be an offense against the laws and authority of the United States; and an action or suit brought in consequence thereof would be one arising under the laws of the United States. But no such violation or interference is shown by the allegations of the bill in * * this case, which simply states the fact that improvements have been made in the river by the government, without stating where, and that Portland has been created a port of entry. See also Cooley's Const. Limitations (5th ed.), 728–733.

Viewed in the light of these authorities, we fail to see in the allegations of the bill anything fatal to the statute. The statute does not attempt to regulate any matter which is national in its character, or affects all the States, and admits of or requires uniformity of regulation; or to interfere with the control of the river for any such purposes by the general government; but, on the contrary, it provides for an improvement purely local in its character. The fact that such government has surveyed the river, and established lights and light-houses, buoys and channel marks in and along it, does not necessarily—if at all—oust a State of its jurisdiction to improve the navigation of the river and remove obstructions from it, or to authorize the same to be done. The improvement to be effected under the act may not, and in so far as the record before us and

50 SUPREME COURT.

Telfair Stockton v. Benjamin R. Powell, et al.—Opinion of Court.

the statute show, do not in any wise affect such surveys nor the purposes of such lights, light-houses and buoys and channel marks, and surely if it be that their establishment has the effect to prevent an improvement by the State which would interfere with their purposes, a statute which does not specify an inconsistent improvement will be construed to intend and authorize only those improvements not interfering with them, and will be upheld for such purposes, and the responsibility will be upon the agencies authorized to make the improvements to do it in such a manner as not to result in an interference, and this too, at the peril of being arrested in the prosecution of their work.

The allegations of the bill as to the jetties and other improvements of navigation of the river by the United States, are answered by the observations just made and those quoted, in the next preceding paragraph, from the cases of Escanaba Co. vs. Chicago, and Willamette Iron Bridge Co. vs. Hatch. The fact that the general government may have made or may be making improvements at one or more places on a navigable river, lying, as does the St. Johns, entirely within a State, does not of itself preclude the right of the State to make improvements at different places. Neither the bill nor the statute shows any interference with the operations, constructions or improvements of the general government, or any violation of any law of the United States.

The bill alleges also that any and all work done upon the St. Johns river under this act must and will be controlled by the government of the United States, and except as that government and its officers and agents may permit the defendants, appellees nor any officers or agents of Duval county will be permitted to conduct and carry on the proposed work upon the river except under the direction of the general government, its agents and officers. This allegation, whether considered as an inference from that immediately preceding it, and set out at the head of this subdivision of the opinion, or as an independent assertion, is a mere conclusion of law which is justified by nothing stated in the bill or appearing on the face of the statute.

III. The validity of the statute is also assailed on the ground that it does not provide any means or method for creating a sinking fund or other fund to pay the principal and interest on the bonds. There is no express provision of this kind in the act. If it be, however, that this power is not otherwise given or is not implied by the authority given to contract the stated debt, or, in other words, to issue not exceeding $300,000 of coupon bonds of the county, in denominations of $500 and $1000, the principal of which is to be payable at the end of not less than twenty, nor more than forty years, and to bear interest at not more than six per cent. per annum, payable semi-annually, the bonds to be engraved, signed and sealed as directed in

the statute, the same to be sold at not less than their face value, and the proceeds applied to improving the navigation of St. Johns river and removing obstructions therefrom, we still do not think this a valid objection to the act or to the issue of the bonds.

IV. Another objection to the act is the alleged non-compliance with the local legislation clause of the Constitution, Section 21, Article III, which is : In all cases enumerated in the preceding section all laws shall be general and of uniform operation throughout the State, but in all cases not enumerated or excepted in that section the Legislature may pass special or local laws : Provided that no local or special bill shall be passed unless notice of the intention to apply therefor shall have been published in the locality where the matter or thing to be affected may be situated, which notice shall state the substance of the contemplated law, and shall be published at least sixty days prior to the introduction into the Legislature of such bill, and in the manner to be provided by law. The evidence that such notice has been published shall be established in the Legislature before such bill shall be passed.

An act of May 31, 1887, Chapter 3708, page 73, of the statutes of 1887, defines the method of publication and of the proof thereof under this provision of the organic law. It requires that it shall be published in a newspaper in the county or counties where the person, matter or thing to be affected resides or is situated, at least once a week for at least sixty days, or by post-

ing the same at not less than three public places therein, one of which is to be the court-house door of the county or counties, and another the locality or localities where the person, matter or thing may reside or be for the time stated, such notice to contain a short statement of the object desired by said special or local legislation. The evidence required of the publishing in a newspaper is the affidavit of the publisher, and that required of the posting is the affidavit of the person posting, such affidavits to be appended to a copy of the notice.

The notice alleged to have been published in this case, as shown by an exhibit to the bill, is as follows:

### NOTICE.

Notice is hereby given that an application will be made to the Legislature of the State of Florida at its next session for the passage of an act enabling the county of Duval to issue bonds not exceeding two hundred and fifty thousand dollars, for the purpose of deepening and otherwise improving the channel of the St. Johns river, within the county of Duval, and for other purposes of public improvement.

February 21, 1891.

There is attached to this copy of the notice an affidavit made December 11, 1891, by the business manager of a designated newspaper published in Duval county, and states that the notice, which is annexed, had been published in the paper once in each week "for ninety-seven days, beginning on the 21st day of February, 1891, and ending May 28th, 1891."

The objections are :

1st. That the notice does not state the substance of the act, as it gives notice of application for an act enabling the county to issue not exceeding $250,000 of bonds, to be used for the purpose of *deepening and otherwise improving* the channel of the river, whereas the act as passed authorizes the issue of bonds to an amount not exceeding $300,000, and the application of the proceeds thereof to the work of *improving the navigation of the river and removing obstructions* therefrom within the county of Duval.

2d. That the notice was published once a *month*, beginning February 21, 1891, and the act was introduced into the Legislature May 2d of the same year.

3d. That the record of the proceedings of the Legislature do not show that evidence that the notice had been published as required by law were established and proven in the Legislature before the act was passed, nor any evidence of such notice.

The obligation resting upon the legislative department of the government to conform to the requirements of this provision of the Constitution, and to the statute law enforcing the same, cannot be questioned. No local or special bill within the purview of the proviso of this section of the organic law should be passed except and until notice of the intention to apply for the passage of the same has been given in the manner contemplated by the Constitution and authorized legislation thereunder, nor is it ever to be presumed that any branch of the legislative department will give its

sanction to any such local or special legislation until legal and satisfactory evidence that such notice has been published shall be "established in the Legislature." This feature of the fundamental law is as binding upon the conscience of those entrusted with the legislative function of the government as is any other part of the Constitution, but this truth is by no means conclusive that power has been given the judiciary to sit in judgment upon the performance of the duty thus imposed upon a co-ordinate branch of the government. No such power has been given to the judiciary. To decide whether or not the notice has been given, is a legislative function, not only in its nature, but as a result of the provision that "the evidence that such notice has been published shall be established in the Legislature before such bill shall be passed," which provision, as excluding any interference in the matter by the judiciary, supplements the inhibition pronounced by the Second Article of the Constitution that no person properly belonging to one of the departments of the government shall exercise any power appertaining to either of the others, except in cases expressly provided for by that instrument.

We are not without authority sustaining this conclusion. The Constitution of North Carolina, framed in 1868, provided, Sec. 14, Art. II, that: "The general assembly shall not have power to pass any private law unless it shall be made to appear that thirty days' notice of application to pass such law shall have been given under such direction and in such manner as shall

be provided by law." In Brodnax vs. Groom, 64 N. C., 244, where the objection to an act was that it had been passed without thirty days' notice of the application, the conclusion of the court was that, taking the statute to be a mere "private act," the ratification certified by the Lieutenant-Governor and Speaker of the House of Representatives made it a matter of record which could not be impeached before the courts in a collateral way; that there could be no doubt that acts of the Legislature like judgments of courts are matters of record, and the idea that the "verity of the record" can be averred against in a collateral proceeding, is opposed to by all the authorities. The first Constitution of West Virginia ordained, Sec. 12, Art. VII, that no new county should be formed having an area of less than four hundred square miles; or, if another county be thereby reduced below that area; or, if any territory be thereby taken from any county containing less than above number of square miles; and that no new county should be formed containing a white population of less than four thousand; or, if the white population be thereby reduced below that number; or, if any county containing less than four thousand white inhabitants be thereby reduced in area. A suit was brought to restrain the collection of county and township taxes of Lincoln county, the bill alleging that at the time of the creation of the county, A. D. 1867, it did not contain four hundred square miles or four thousand white population, and that by its creation the county of Cabell was reduced below the area of four hundred square miles; and that although by

an act of 1868 sufficient territory was added to Lincoln county to give it an area of four hundred square miles, its population was still below four thousand, and Cabell county was still further reduced in territory by that act; and that though by an act of 1869 additional population and territory were added to each of the named counties, the county of Cabell still contained less than four hundred square miles. The Supreme Court of that State in Lusher vs. Scates, 4 W. Va., 11, held that the subject of creating new counties belonged to the Legislature alone, and to exercise the power conferred, it must inform itself of the existence of the facts, including those as to area and population, and others indicated above, prerequisite to enable it to act on the subject; and that how it might do so and upon what evidence, the Legislature alone must determine, and that its determination, when made, concluded all further inquiry by all other departments of the government; and that its final action terminating in an act of legislation in due form must of necessity presuppose and determine all the facts prerequisite to the enactment. That the courts could not go into an inquiry as to the truth or falsity of the facts upon which the legislation is supposed to be predicated where the Legislature has sole jurisdiction of the subject. In Rumsey vs. People, 19 N. Y., 41, it was held that the question whether the territory of a new county contained a sufficient representative population, such question involving the legality of its organization, was one which the Legislature determined as a question of fact, and that its determination was not reviewable elsewhere;

and in De Camp vs. Eveland, 19 Barb., 81, the decision was that the presumption that the Legislature acted on good and sufficient evidence of there being the population required by the Constitution was conclusive.    See also Advisory Opinion, matter of impeachment, 14 Fla., 289; People vs. Hurlburt, 24 Mich., 44; Day vs. Stetson, 2 Me., 365; McClinch vs. Sturges, 72 Me., 288; Cooley's Constitutional Limitations, 163, note 3.

If there is any defect in the notice or in its publication or in the proof thereof, we have no jurisdiction to consider it.    That jurisdiction is in the Legislature, and has been exercised, and that department of the government has by the passage of the act under consideration, the validity or formality of which passage is not otherwise questioned, pronounced its judgment evidenced by the journals and the act, a record of the highest character, that the special or local legislation clause of the Constitution, and of the legislation thereunder, have been fully complied with; and we are concluded by that judgment.    Charges in a bill in equity, and the admission of them by demurrer or otherwise, that these constitutional and statutory provisions have not been complied with, can not extend our jurisdiction.    The Legislature, not the courts, are the guardians of the interests which the fundamental law has sought to protect by requiring notice of local or special legislation, and that department is responsible to the people for the due protection of these interests by seeing that the Constitution and the law are complied with.

As to the objection that the records of the proceedings of the Legislature do not show that evidence of the publication of the notice was established in the Legislature before the act was passed, it is enough to say that the Constitution does not require that the Legislature should make its record do so, and the courts are without jurisdiction to require it.   Cooley's Constitutional Limitations, 163, 164; Florida Constitution, 1885, sections 12, 17, 21, of Article III.

V. There are also certain objections concerning the election held under the statute, the canvass of the votes and the resolution as to the issue of the bonds, which can be more satisfactorily dealt with after stating certain provisions of the statute and the averments of the bill as to such matters.

The act (sec. 1) authorizes and directs the Board of County Commissioners to call an election to be held by the registered voters of said county, at which the registered voters are authorized to vote for or against the issuing of the bonds provided for; such election (sec. 2) to be held at indicated places, provision being made for the appointment or selection of inspectors. It then (sec. 3) provides that "the election shall be conducted and returns made thereof in the manner prescribed by law for conducting elections and canvassing and making returns of votes cast," and (sec. 4) that any person "whose name is not already enrolled as a registered voter in said county, and who is entitled to be registered as a voter," shall be allowed to register at the office of the supervisor of registration

at any time after the ordering of the election and until the third day prior to the holding of the election; and directs that the supervisor of registration shall deliver to the sheriff a paper book for each election district, containing in alphabetical order the names "of all persons registered as voters of such districts, including the names of all persons previously registered whose names remain upon the registration book in the office of said supervisor;" and makes it the duty of the sheriff to deliver these books to the inspectors, and the duty of the supervisor to keep open his books daily except Sunday, from the day of the ordering of the election to and including the third day previous to the day appointed for the election, and to "register as voters all persons who apply to be registered and are entitled thereto, and to deliver to each person registered a certificate of such registration, as provided in the law on that subject, free of expense to persons registered." It also enacts (sec. 5) that "every person whose name shall appear on the registration books, and every person holding a certificate of registration showing that he is a registered voter, and who has not lost the right to vote for any cause as provided by law, shall have the right to vote at such election." The sixth section of the statute enacts that the Board of County Commissioners at "any regular or special meeting" after the passage of the act shall by resolution to be recorded in their minutes appoint a day for the holding of the election, such day to be not less than ten days after the first publication of a copy of the resolution, in three or more newspapers in the county;

and that the board shall appoint the inspectors "to conduct the election and make returns of the votes cast," and that such returns shall show the whole number of votes cast at the election, and how many of them were cast "for bonds," and how many "against bonds," and that said returns shall within two days after said election be delivered to the Clerk of the Circuit Court to be laid before the Board of County Commissioners, which board shall publicly canvass the same at their next regular or special meeting and declare the result of the vote, which vote shall be recorded by the clerk. The seventh section declares what words, viz: "for bonds," or "against bonds," shall be printed or written on a ballot, and that every such ballot shall be counted as lawful without regard to the form or size of the paper, or the color thereof, "to the end that the true expression of the will of the voter may be ascertained;" and the eighth section provides that if a majority of the electors vote "for bonds," the county commissioners shall issue the bonds as provided by subsequent sections of the statute.

The bill, including the records of the county commissioners made part thereof as an exhibit, shows that "the board met this 12th day of November, in special session, called by the chairman for the purpose of ordering an election" as to issuing bonds under the act in question, and that there were present three members, Powell, the chairman, Baer and DeCottes, but the other members, Kelly and Pickett, were absent, and the board, in consequence of their absence, adjourned

to the 14th day of the same month; on which day it met again, all the members, except Kelly, being present, and passed a resolution calling an election to be held Thursday, December 3rd, 1891, and appointed inspectors of the election.

Notice of the election was given, and the election was held on the day appointed. The bill states that the total number of votes cast were 2,198, of which 1,455 were "for bonds," and 714 "against bonds," and 20 "not for bonds," and 8 blank. That on December 2nd, 1891, the full board met in regular session, and adjourned to the 9th day of the same month, on which day they met in adjourned session for the purpose of canvassing the vote of such election, at which adjourned meeting only four Commissioners, Powell, De-Cottes, Kelly and Pickett, were present, and at such adjourned meeting proceeded to canvass the returns, which were presented by the clerk under seal, from every election district in the county, except one, at which no election had been held, and declared the result of the election as set forth above, and at the same meeting a resolution, reciting the law and the facts and the result of the election, and directing the preparation and issue of $300,000 of bonds in accordance with such act and election, was passed.

With the above statement we will present the objections made in the bill and brief, and our views of the same.

It is objected in the bill that the minutes of the

Board of County Commissioners do not show "what notice was given" of the special meeting of November 12th, and also that the commissioners were not authorized by the statute in question, or other law, to take the action had at the meetings of November 14th and December 9th. And it is said in the brief of appellant's counsel that the ground mentioned in the bill is that the meetings of November 14th and December 9th were not "regular or special" meetings, and that the action taken at the meeting of November 14th, calling the election, was unauthorized and void ; and it is further said, that the proceedings of the commissioners attached to the bill show that on November 12th, and without any record or showing of a previous call of the board, three commissioners, Powell, Baer and DeCottes, met in an alleged "called" meeting of the board, and that they adjourned this called meeting to November 14th, but that their record does not show that notice of the call or adjournment was given ; and that on the 14th of November they met and issued the call for an election. "The question here presented," says counsel for appellant, is, "had these three commissioners power to adjourn the alleged called meeting, and at the adjourned meeting to order this election ?"

In Douglass vs. County Commissioners of Baker County, 23 Fla., 419, it was held that a special or called meeting of county commissioners in which all the mem-

bers participated, the same having been held before the day to which the board adjourned at a preceding session was valid. If it be that personal notice to each commissioner of both the time of the meeting and the subject-matter to be considered is necessary to the legality of a special or called meeting (a proposition which we do not mean to deny : Dillon's Mun. Corp., sec. 286 ; Smyth vs. Darley, 2 H. L. Cases, 789), or if it be, as implied by the objection, that the record of the commissioners must show such notice as an essential to the validity of the meeting, (a point not affirmed by the authorities found in our investigations : Sergeant vs. Webster, 13 Met., 497, 504 ; Citizens' Mutual Fire Ins. Co. vs. Sortwell, 8 Allen, 217.; Chosen Freeholders of Hudson Co. vs. State, 24 N. J. (Law), 718,) our opinion still is that the statements of the minutes of November 12th, quoted above, is sufficient evidence of such notice having been given, where, as here, it is not charged and proved that notice was not given. The board having then met legally or upon due notice to all the members, the three members, a majority of the board, then present had authority to adjourn the meeting to a subsequent day, which it seems a majority could have done. People *ex rel.* Butts vs. Common Council of Rochester, 5 Lansing, 142. Each member present had notice of the adjournment, and those not present at the adjourned meeting were charged in law with notice thereof. Smith vs. Law, 21 N. Y., 296. The adjourned special meeting was a continuation of

the former one, and anything done at it concerning the election was as legal as if it had been done before the adjournment. Scadding vs. Lorant, 5 English Law & Eq., 16; City of New Orleans vs. Brooks, Connor & Norton, 36 La. Ann., 641; *Ex parte* Mirande, 73 Cal., 365; Chamberlain vs. Dover, 13 Me., 466. The power of adjournment is incident to special meetings, (Dillon's Mun. Corp., sec. 285,) as it is to regular meetings, (People vs. Martin, 5 N. Y., 22; Goodell vs. Baker, 8 Cowen, 285; Chamberlain vs. Dover, *supra*,) and it is from this power that adjourned meetings arise.

As to the meetings of November 14th and December 9th not being either "regular or special" meetings within the meaning of the statute, it is of course entirely clear that the former was an adjourned special meeting, and the latter an adjourned regular meeting, as is shown by copies of the minutes of the commissioners annexed to the bill. In *Ex parte* Mirande, *supra*, it was held that an ordinance passed at an adjourned meeting was not invalidated by the fact that the clerk of the board described the adjournment, in the record of the proceedings, as a "recess" so of course the use of the word "session," instead of "meeting;" in the record of the proceedings does not invalidate meetings. Besides this, the canvass of the returns, and the adoption of the resolution on the ninth of December were at a regular or special meeting

within the meaning of the statute ; or, in other words, the adjourned meeting of that day was a lawful meeting for such purposes. It is to be observed that the minutes of the "regular monthly session" of December 2d was attended by all the members, and after transacting all the regular monthly business, they adjourned to meet on the ninth day of the same month, at ten o'clock A. M. The minutes of December 2d do not show the purpose of the adjournment, but the presumption is that it was for a lawful purpose. Moreover, each member was charged with notice of any action lawful to be taken at such adjourned meeting ; and anything done at such adjourned meeting which it it was within the power of the board to do, was as lawful as if it had been done by a full board, instead of only four members. Smith vs. Law. 21 N. Y., 296. Each member was as much charged with notice of lawful action to be taken at such adjourned meeting as he would have been had the meeting not adjourned, but had continued in session from day to day until the last day mentioned ; and the public are as much bound as if a full board had been present on that day. By the adjournment each member was in law charged with the official duty of being present at the time to which they adjourned, to attend to any business within the power of the board, and if it was within the power of the board to act on these returns or to pass the resolution as to the bonds, the absence of one of the commissioners, Mr. Baer, from the adjourned meeting does

not impair the legality, for he and the other members adjourned to the time for the purpose of doing any lawful business. The remaining inquiry, under this head, consequently is whether the statutory grant of power is so limited as to preclude the board from exercising the authority at a meeting originating prior to the election, but extended by a full board beyond the receipt of the returns. We do not think the purpose of the provision that the board "*shall at its next regular or special meeting*" canvass the returns and declare the result of the vote was, even in so far as the words italicised can be taken to indicate a legislative intent, to exclude from a meeting originating before, but continuing after the election, or the receipt of the returns by the clerk, the power to make the canvass; but in our judgment the purpose was to secure promptness of action in the matter, and the law made it the duty of the clerk to lay the returns before the board as soon as it should be in session after he received them, and made it the duty of the board to canvass them whenever they should be in session, whether it should be a regular or a special meeting, and it charged each member with notice that such duty would be incident to any meeting, whether regular or special, at which the returns might be received, regardless of the fact that the meeting may have originated before the election or receipt of the returns; or, if a special meeting, may have been called for another purpose. The power to canvass was given to the board, and the

mere fact that a meeting originated before the election
or the receipt of the returns is not made the ground
for excluding the exercise of the power. Had the
board remained in session till after the election, and
then received the returns they could have canvassed
them, and the power to do it was not lost by the ad-
journment. Dillon's Mun. Corp., sec. 287. In view
of the fact that, having finished all the regular monthly
business, yet they adjourned to the day stated, and
on that day took up these matters, is of itself presump-
tive evidence that they were the purpose of the ad-
journment, and this presumption is aided by the state-
ment upon the minutes of the adjourned meeting that
they met for the purpose of canvassing the returns,
which statement if not sufficient to exclude the idea
that the cognate and dependent matter of issuing the
bonds was within the purpose of the adjournment.
This adjourned meeting was certainly tantamount to a
subsequent special meeting of whose time and purpose
all the members were notified.

The result of the election, as ascertained by the can-
vass, was that 2,198 were the whole number of votes
cast, and that for bonds there were 1,435, and against
bonds 714; not for bonds 21, and blank 8 votes. The
third objection, as stated in the bill, is that 1,772 of
the voters had not paid the capitation or poll tax for
the year 1890, and only 426 voted who had paid it for
that year; and 2,132 voted who had not paid such tax

for the year 1891, and 60 persons voted who had paid it, "as shown by comparison of the poll lists with the record of payment of poll taxes." That no person was entitled to vote at said election who had not paid the poll taxes for 1890 and 1891, and that by reason of the above stated number of votes having been cast at said election for bonds by persons who had not paid said poll taxes and were not entitled to vote, the alleged majority was obtained in favor of issuing said bonds, and if said votes had not been received, a majority of votes were not cast for bonds. That the public records in the office of the tax collector of Duval county show that of the persons who voted at said election, only 426 had paid their poll tax for 1890, and only 60 had paid it for 1891.

The question presented by this objection is whether or not the payment of the poll or capitation tax was a qualification for voting at the election.

The Constitution (sec. 8, Art. VI) provides that the Legislature shall have power to make the payment of the capitation tax a prerequisite for voting. The Legislature of 1889 passed a statute (Chapter 3850, approved May 25th,) enacting that a capitation tax of one dollar shall be assessed against all male citizens of the State, of twenty-one years and upwards, and that thirty days prior to any general, special or municipal election to be held in this State, the collectors of revenue of each county shall furnish to the supervisors of

registration in each of their respective counties a list
of all persons who have paid their capitation taxes for
two years next preceding the year in which any gen-
eral or special or municipal election is to be held, and
that the supervisors shall note on the registration
books now required by law to be furnished to inspec-
tors of elections, the names of all persons who have
paid their capitation or poll taxes, and only such per-
sons shall be deemed qualified electors and authorized
to vote at any general, special or municipal election, it
being provided, however, that no person who was not
a resident of this State for any years for which a poll
tax is by this act required to be paid, but is otherwise
a qualified voter, shall be prevented from voting by
reason of not having paid such taxes; and, further,
that all persons who may have arrived at the age of
twenty-one years after the year for which a poll tax is
required by this act to be paid, shall not be prevented
from voting by reason of not having paid such poll tax.
There is also a provision that the poll tax of 1889 alone
need be paid in so far as the general election of 1890 is
concerned. It also directs the preparation of tax re-
ceipts, to be issued by the collectors of taxes to all
persons upon payment of taxes hereinbefore required,
and the presentation of such tax receipts, obtained at
least thirty days prior to any general, special or mu-
nicipal election, by a registered voter whose vote is
challenged on the ground that his name does not ap-

pear on the lists provided for above as having paid his capitation tax, is made an answer to such challenge.

Recurring to the act for the improvement of the St. Johns river, as it is set forth in the first part of this sub-division of the opinion, we find that it is a complete system of itself, and that there is in it no requirement that the payment of any poll taxes shall be a qualification or prerequisite to voting, nor any provision that the collectors of taxes shall furnish supervisors of registration with the names of persons who have paid their capitation taxes, or that the latter officers shall note on the registration lists, or paper books, furnished inspectors the names of such persons. There was no previous law providing for an election of this kind; neither the general election law of 1889, Chapter 3679, nor the county bond act of 1877, McClellan's Digest, 129-32, do so. This election is not one within the meaning of that provision of the poll tax act which directs the supervisors of registration to note on the registration books "*now* required by law to be furnished to inspectors," the names of persons who have paid the tax. The notice of election prescribed by either of these acts, nor the time for registration provided by the act of 1889, or by the other if it makes any provision, nor the mode of making and canvassing returns of election under either, in so far as the officers to whom they are to be made, or by whom they are to be canvassed, or as to requiring duplicate returns, have not been adopted by the statute under

consideration. It is a perfect system within itself, and adopts no provision of any other statute except in so far as its third section appropriates for supplying any deficiency in its own provisions as to the conduct and returns of the election, the existing law on those subjects. When we consider this, and the fact that the Legislature, though it made it the duty of the supervisor of registration to furnish inspectors with lists of registered voters, but did not require that he should note the names of persons who had paid the poll taxes as is required by the act of 1889, as to special or other elections to which it is applicable; and, further, that it made no requirement that the collector of taxes should furnish him with the inforformation necessary to the performance of that duty, the only reasonable conclusion is, that the law-makers did not intend to make the payment of the tax a prerequisite to or qualification for voting at such election. There is in the act nothing inconsistent with this conclusion; but, on the contrary, there is apparent upon its face the intent that persons duly registered *as voters*, and retaining the qualifications which preserve the legality of their registration, should vote independent of any question of paying the poll tax. This is the result of the provisions of the first, fourth and fifth sections of the statute, *supra*, and when in the last of these sections it is said that "every person whose name shall appear on the registration books, and every person holding a certificate showing that he

is registered *as a voter*, and who has not *lost the right
to vote for any cause as provided by law*, shall have
the right to vote at such election," the meaning of the
words last italicised is the loss of the qualifications
which preserve a person's right to have his name kept
on the registration list; or, in other words, any of
those which would, had they existed at the time of
his registration, have rendered it illegal. Sections 1,
4, 5, Article VI, Constitution; Section 1, Chapter
3879, p. 88, laws 1889. Legal registration with a re-
tention of the requsites therefor is the qualification,
and nothing not essential to it is a disqualification.
Payment of the poll tax is not such an essential.

Another objection is, that certificates of the above
election were returned to the county judge, super-
visor of registration, and the Clerk of the Circuit
Court, and the oaths of inspectors and poll lists of
persons who voted, were returned to the supervisor of
registration, together with the ballots in the ballot
boxes used. That the canvass of the votes were made
by the county commissioners from the returns made
to the Clerk of the Circuit Court and county judge,
and no canvass was made by the county judge and
supervisor of registration, and a member of the
Board of County Commissioners, or in any manner
pointed out by the acts "to provide for elections gen-
erally, and for returns of elections," Chapters 3079
and 4040, statutes of Florida, and that the canvass
was therefore illegal.

It was unnecessary for the inspectors to send cer-

tificates of the result of the election to the county
judge and supervisor of registration, but entirely
immaterial that they did so.   The provision of the
general election law requiring certificates to be sent to
them, was rendered inapplicable to this election by
the provision of the act in question requiring the re-
turn or certificate of result should be delivered to the
Clerk of the Circuit Court.   That the oaths of inspec-
tors and poll lists were sent to the supervisor of reg-
istration, with the ballots and ballot boxes, is entirely
immaterial, if irregular, yet we are not prepared to
say that the general election law did not require that
this disposition should be made of the poll lists and
oaths of inspectors.   Such irregularities do not affect
a canvass of returns by a body authorized to perform
the function, and doing it properly.   It was the duty
of the Board of County Commissioners to canvass the
returns, and the county judge and supervisor of reg-
istration had nothing to do with it; and the fact that
the commissioners had before them a return made to
the county judge, as well as that made to the clerk,
was immaterial.

VI. The only point to be noticed is that involved in
a statement made in the bill to the effect that the stat-
ute provides that the bonds "shall bear the seal of
the aforesaid county of Duval," and that at the time
the act was passed, the county had no seal, but that
the defendants on their meeting of December 9th, at-
tempted to adopt the seal of the Circuit Court for the
county as the seal of the county, and intend to attach
the impression of this seal to the bonds.   The action

of the board on this subject was a resolution, "that the seal of the Circuit Court for Duval county and of this board now in use is hereby adopted as the common seal of Duval county."

The Constitution of 1868 provided for Circuit Courts, dividing the State into seven circuits, and directing that at least two terms should be held every year in each county, and for a Clerk of the Circuit Court in each county; and for county courts in each county, and for a county judge, who was judge of the county court, and these county courts were given criminal jurisdiction, civil jurisdiction in certain cases at law, and surrogate or probate powers. The same organic law also made the Clerk of the Circuit Court in each county, "clerk of the county court, and of the Board of County Commissioners, recorder and *ex-officio* auditor of the county." The Legislature of 1868, McClellan's Digest, pp. 931, 932, made it the immediate duty of the Attorney-General to devise suitable seals for the use of the Circuit Courts and County Courts in each county, or to approve and adopt the seals then in use in any county where the same might be appropriate, and to deposit in the office of the Secretary of State, and that of the Clerk of the Supreme Court, immediately after he should devise or adopt the same, a true description of each of such seals, with an impression thereof in wax, wafer or other material. The act also authorized the Attorney-General, whenever it should be necessary to devise a new seal for the Circuit Court of any county, to cause to be manu-

factured the necessary seal and press for using the same, and directed that he should cause to be manufactured the necessary presses and seals for the several county courts, and that he should transmit to the clerks of the courts in each county the presses and seals devised for each county, and that from and after the day of receiving such seals by the clerk of any county, such seals should be respectively the seals of the circuit court and of the county court, as the same should be designated by the Attorney-General. The statute also enacted that the seal provided for each county court should be the official seal of that court in all criminal and civil, including probate, matters, wherein seals are required to be used, and "the official seal of the clerk as clerk of the Board of County Commissioners." Another provision of the act was that until such seals should be devised and procured, *and received by the clerks as aforesaid*, the seal heretofore used as the seal of the circuit court in each county shall be continued to be used as the seal of that court, and "the seal heretofore used as the seal of the probate court shall be recognized as the seal of the county court, and of the clerk of the Board of County Commissioners, until a new seal shall be procured and received as aforesaid."

In 1875 the Constitution was so amended as to take from the county courts their criminal jurisdiction, and civil jurisdiction except in probate matters, and county judges were retained and given a limited civil and criminal jurisdiction. In the revision made of the

Constitution in 1885, circuit courts are retained as a part of the judicial system, and county judges (Secs. 16, 17, Art. V,) are given a limited civil jurisdiction, and general surrogate or probate powers, and jurisdiction of such criminal cases as the Legislature may prescribe. The Legislature is also authorized to create, in any county where it may be necessary, a county court having jurisdiction in all cases at law, where the demand or value of property involved does not exceed $500, and of forcible entry and unlawful detainer, and of misdemeanors, and appellate jurisdiction in civil cases arising before justices of the peace, and of this court it is provided that the county judge shall be the judge. The same fundamental law ordains (Sec. 15, Art. V,) that the clerk of the circuit court "shall also be clerk of the county court, except in counties where there are criminal courts, and of the Board of County Commissioners, and recorder, and *ex-officio* auditor of the county." Where there is a criminal court of record in a county, its clerk is made clerk of the county court, if there is a county court there. There is no county court in Duval county, although there is a criminal court there. There has been no legislation since the act of 1868, *supra,* concerning the seal of the county court.

Relying upon the act of 1868, counsel for appellant contend that the seal of the county judge of Duval county is the proper seal to be used, and that the resolution was unauthorized. There is no doubt that the Attorney-General devised and procured seals for

county courts under the above statute, yet without questioning that such seals, where they were received by the clerks of the county courts, under the act, are now the seals of county judges, as courts of probate, under the present Constitution ; and of the clerks of the Board of County Commissioners ; still such a seal is not now, and never was, the seal of the county any more than, or to the exclusion of, the seal of the circuit court. Technically speaking, there is not, and has not been, within the period covered by the organic or statutory law referred to, any seal of Duval, or of any other county, yet it is true that in a certain sense, and for certain purposes, both the seals of the county court, or county judge, and that of the circuit court, have been and are seals of the counties. They are used by county officers and in connection with official functions of such officers, and are seals of the county, as distinguished from any other territorial subdivision of the State, or the State itself. The circuit court seal is used by the clerk of the circuit court in all functions whose performance requires a seal, and, among others, those of auditor of the county, which he is by virtue of his office as such clerk. Ray vs. Wilson, 29 Fla., ——; 10 South Rep., ——; McClellan's Digest, sec. 31, p. 179, and sec. 12, p. 317. In our judgment either of these seals is, within the meaning of the statute under consideration, the seal of Duval county, and might be adopted or used by the commissioners in sealing the bonds; and the resolution to the extent that it indicates the will of the Board of County Commissioners that the seal of the circuit court shall be so used, is

valid and proper, but that it is effectual for any further purpose, or as establishing a distinctive county seal, we fail to perceive.

We have given to the questions raised by the bill the careful investigation and deliberate consideration merited by their character, and by the interests involved, and our judgment is, that the decree dismissing the bill should be affirmed. It will be decreed accordingly.