BOARD OF SUPERVISORS OF WAYNE COUNTY *v.* WAYNE
CIRCUIT JUDGES.

1. BOARD OF SUPERVISORS—SPECIAL MEETING—NOTICE—PROOF OF
SERVICE—JURISDICTION.
    Under a statute authorizing the calling of a special meeting
    of a board of supervisors by giving written notice to each
    member thereof, proof of service of such notice need not be
    filed with the board, or spread upon the record of its pro-
    ceedings, if there is no provision requiring it. The presump-
    tion is that such a meeting was legally convened, and the
    burden of proving the contrary rests upon him who assails
    its validity.

2. ELECTIONS—PUBLIC IMPROVEMENTS—CORRUPTION OF VOTERS.
    An election in favor of a loan for the erection of county build-
    ings is not invalid for corruption because of the use of post-
    ers urging working men to vote therefor on the ground that
    it would furnish them employment.

3. MUNICIPAL CORPORATIONS—INDEBTEDNESS—SUBMISSION **TO** VOTE
OF ELECTORS.
    It is immaterial that a majority of the taxpayers of a munic-
    ipality are opposed to the incurring of certain indebtedness,
    where the statute provides for the submission of the ques-
    tion to the electors, and they have declared themselves in
    favor of the proposition.

4. MANDAMUS—DISSOLUTION OF INJUNCTION—PUBLIC IMPROVEMENTS.
    *Mandamus* will lie to vacate a preliminary injunction restrain-
    ing a board of supervisors from purchasing a site for county
    buildings, and from issuing bonds in payment therefor, pur-
    suant to a vote of the electors, where the averments of the
    bill, conceding them to be true, are insufficient to warrant
    the issuance of an injunction.

*Mandamus* by the board of supervisors of the county of
Wayne to compel the circuit judges of Wayne county to
vacate a preliminary injunction. Submitted June 18,
1895. Granted July 2, 1895.

Some time during the latter part of the year 1894 the
supervisors of Wayne county took proceedings for the

purchase of a site for, and the erection of, a courthouse
and other buildings. The question of bonding the county
for $1,500,000 for that purpose was submitted to the elect-
ors, and carried by a vote of 13,308 to 3,442. That action
was restrained by the court at the instance of the attor-
ney general by decree dated December 31, 1894, for rea-
sons unnecessary to mention.

An act was passed by the present legislature, and
approved February 20th last, authorizing the supervisors
of that county to hold a special meeting in February or
March, 1895, to consider and determine the necessity
of purchasing a site for buildings for a courthouse and
county offices, for a jail and sheriff's residence, and for
other needful purposes for said county, and of erecting
suitable buildings for such purposes, and to provide for
submitting the question to the electors of raising by loan
upon the bonds of said county such sums as they might
deem necessary therefor (Act No. 295, Local Acts 1895).
Section 2 of the act provided that such special meeting
should be held upon a request therefor in writing, signed
by at least one-third of the supervisors of the county, and
specifying the time and place of such meeting. Upon
receiving such request, the county clerk was required to
give immediate notice of such meeting in writing "to
each of the supervisors, by causing the same to be deliv-
ered to such supervisor personally, or by leaving the same
at the place of residence of such supervisor, or by
depositing the same in the mails, postage prepaid,
addressed to such supervisor at his place of residence, at
least six days before the time of such meeting."

The requisite number of supervisors—28—signed and
presented the call to the county clerk pursuant to this law
for a special meeting to be held March 4th. The clerk
immediately gave notice, and served it as hereinafter
stated. The board met at the time specified, 41 of the 54
supervisors being present. The proper resolution was
passed determining the necessity, and submitting the

question of bonding the county for $1,500,000 to purchase a site and erect buildings. The election was held, and the proposition adopted by a large majority. After the election, more than one-third of the supervisors signed and presented to the county clerk a request for a special meeting to be held May 1st. Notices were given by the clerk in the manner hereinafter set forth. Posters without any signature, printed in three different languages,— English, Polish, and German,—were placarded in various places in the city of Detroit, reading as follows:

"Attention, voters! Don't forget to vote *yes* for a new county building. It will distribute $1,000,000 among the working men of Detroit, and give employment to a great many men."

At the second special meeting, the board passed the necessary resolutions preparatory to the purchase of a site and the issue of bonds. At this point the attorney general, upon the relation of certain citizens of Detroit, filed a bill in chancery to restrain this action of the board, and prevent the purchase of the site or the issue of the bonds. The respondents issued a restraining order until the final hearing of the case, whereupon the relator filed in this court its petition for a writ of *mandamus* to compel the vacation of that order, insisting that it is an abuse of discretion, and that the bill made no case for the interference of a court of equity.

*F. A. Baker*, for relator.

*Fraser & Gates*, for respondents.

GRANT, J. (*after stating the facts*). Two objections are raised against the proceeding: (1) That there was no legal evidence before the board of supervisors at either of their meetings, on March 4th or May 1st, of the service upon each supervisor of the notice of the meeting, and that, without such evidence before them, it had no jurisdiction to proceed. (2) That the election in favor of said loan was obtained and procured through and by means

of the corrupt offers or inducements to laboring men through the posters.

1. It is conceded that the notices were in proper form. The regularity of the proceedings is not attacked, except the proof of service of the notices. Proof of service of notice of both meetings was made,—upon some by mail, and upon some by serving personally. It is unnecessary to determine the question whether this proof was sufficient. In response to the first call, 41 out of the 54 supervisors were present at the meeting. In response to the second call, 48 out of the 54 supervisors were present, and one of the absentees was in Europe. It was not alleged in the bill, nor was it claimed upon the argument, that the supervisors were not actually served. The statute does not require proof of the service to be filed with the board, or to be recorded upon the record of its proceedings. The presumption is that such meetings are legally called, and it is incumbent upon him who attacks the validity of the meeting to show that the notices were not in fact served. *State* v. *Board of Commissioners,* 104 Ind. 123; *Stockton* v. *Powell,* 29 Fla. 63; *Brigins* v. *Chandler,* 60 Miss. 862; *Corburn* v. *Crittenden,* 62 Miss. 125; *Rutherford* v. *Hamilton,* 97 Mo. 543; *Taber* v. *Ferguson,* 109 Ind. 227; *State* v. *City Council of Elizabeth,* 30 N. J. Law, 365.

2. It remains to consider the question of corruption of the voters. We should not feel inclined to give this serious consideration were it not for the eminent counsel who have made the charge, and who, we must assume, have argued it in good faith. It is alleged in the bill of complaint "that the public sentiment in the city of Detroit, and throughout the county of Wayne, and the wishes and desires of the taxpayers thereof, are by a very great majority opposed to the purchase of any site for any county building, or the erection by said county of any building for a courthouse and county offices." This allegation seems somewhat strange in view of the fact that the electors have twice within six months declared by very large majorities in favor thereof. There is nothing

to show how many of the electors were taxpayers and how many were non-taxpayers. The wishes and desires of the non-taxpayers are just as valid in the eye of the law as those of the taxpayers. It may be unjust and unwise to permit non-taxpayers to determine how much and for what the property owners of a municipality may be taxed. The people, however, have by statute law settled that matter, and it is no concern of the courts whether the sentiment of the taxpayers is for or against it. It is the majority of the electors who, under the statute, are entitled to decide the question.

Electors have not yet risen to that high state of morals that they will consider the public good and public necessity alone. In all elections electors are appealed to, both on the hustings and in the press, to vote for measures which will conduce to their own private interest. The laborer desiring work had the same right to vote for this proposition because he thought or was told that he would obtain work, as the property owners near any proposed site would have to vote for it because they believed the improvement would enhance the value of their property. The relators named in the bill of chancery are prominent, well-known, and worthy citizens of the city of Detroit. It is alleged in the answer that they and many others who own property in the vicinity of the present city hall are against the building of separate county buildings, and in favor of tearing down the present city hall, and erecting on the present site a building for the joint use of the city and the county, under arrangements to be agreed upon between the two, because they believe that their property in that vicinity would be largely enhanced in value. If such a proposition were submitted to the electors, and the property owners in that vicinity should vote for the proposition because it would put money into their pockets, and should in the press or in public meetings, or in private solicitations, urge electors to vote for it for that reason, would they consider themselves to have been guilty of

corrupting the voters? If the principle insisted upon is correct, there is probably not a single county building, or the removal of any county seat, which could not have been enjoined on the ground of the corruption of voters. We are cited to no authorities, nor do we believe that one can be found, holding that votes cast from such motives are in law corrupt and venal. It is unnecessary to pursue the subject further.

We have applied the rule urged in behalf of respondents by their learned counsel that "this court ought to go no further than to look into the information to see if it could, under any circumstances, support an injunction." If it could be admitted that all the averments in the bill in chancery in this regard were true, it would not authorize a court of equity to enjoin the proceedings. It would, moreover, be difficult to secure the construction of any necessary public improvement, dependent upon the vote of the electors, if courts of equity might restrain for such reasons. We think that important public improvements should not be compelled to await the "law's delay" consequent upon the final determination of a long chancery suit, and that the writ of *mandamus* is proper, under the circumstances, to obtain a speedy determination.

We think there was no ground for issuing the injunction, and the writ must issue ordering its dissolution.

McGRATH, C. J., MONTGOMERY and HOOKER, JJ., concurred. LONG, J., did not sit.