THE STATE OF FLORIDA *ex rel.* JOHN MILTON, JR., *et al.,* PLAINTIFF IN ERROR, vs. E. T. DICKENSON *et al.,* AS COUNTY COMMISSIONERS OF JACKSON COUNTY, DEFENDANTS IN ERROR.

CONSTITUTIONAL LAW—STATE MILITIA—TAXATION FOR ARMORIES—SECTION 27, CHAPTER 4684, LAWS 1889, UNCONSTITUTIONAL.

1. The militia of the State is an arm of the State government, and is in no sense such a county institution or establishment as that any particular county can, exclusively, be required to impose taxes for its, or any part of its, maintenance.

2. Section 27 of Chapter 4648, laws of 1889, requiring the board of county commissioners in each county in which there is a company or battery or State troops to provide each company or battery with an armory for its meetings, drills, &c., Held to be unconstitutional and void.

Writ of error to the Circuit Court for Jackson County.

STATEMENT.

The plaintiffs in error instituted mandamus proceedings in the Circuit Court of Jackson county against the county commissioners of said county. An alternative writ was granted and issued and alleges as follows: "In the name of the State of Florida: To E. T. C. Dickenson, Chairman, Frank Peacock, A. A. Stribling, C. B. Pledger and J. W. Carter, members of the Board of County Commissioners of Jackson county, Florida, and composing said Board of County Commissioners. Greeting: Whereas, a sworn petition of John Milton, Jr., as Cap-

tain, C. L. Wilson as First Lieutenant, and George Horne as Second Lieutenant, of a military company known as the Jackson Guards, and designated as Company M Third Battalion, First Regiment of Florida State Troop s, shows that John Milton, Jr., is Captain, and C. L. Wilson is First Lieutenant, and George Horne is Second Lieutenant, of a military company known as the Jackson Guards; that said military company has been duly mustered into the service of the State of Florida, and is a part of the Florida State Troops and known and designated as company M Third Battalion, First Regiment Florida State Troops; that it contains, rank and file, forty men; that said men all reside at Marianna, Jackson county, Florida, and in the immediat vicinity of said town, except one or perhaps two who were enlisted and were mustered in in said town and have since removed; that said military company has been duly armed and equipped by the State of Florida, and has possession of a large quantity of arms, uniforms and other military equipments furnished by the State; that said company has no armory suitable for its meetings and drills and for the safe storage of its arms and equipments; that its captain and commissioned officers have applied to the county commissioners of Jackson county, State of Florida, to provide them with an armory suitable for its meetings and drills and for the storage of its arms and equipments, but said respondents have wholly neglected, refused and failed to provide such an armory. * * * * * .* In the name of the State of Florida, You are hereby commande d to provide a suitable armory for its meetings and drills, and for the safe storage of its arms, of the Jackson Guards, Company M Third Battalion, First Regiment, Florida State Troops, forthwith, or

to show cause before the Judge of the First Jundicial Circuit of Florida, at his office in the city of DeFuniak Springs, Florida, Walton county, at 10 oclock a. m. on the 16th day of September, 1901, why you should not do so; that you have then and there this writ."

The respondents moved to quash the alternative writ upon the following grounds: 1. That section 27, Chapter 4684, acts of 1899, laws of the State of Florida, under which said alternative writ was issued, is null and void for the following reasons: (a) That said section is in contravention and contrary to section 5, Art. IX, of the constitution of Florida; (b) that said section is in contravention and contrary to the provisions of sections 20, 21, Art. III of the constitution of the State of Florida; (c) that said section is contrary to the provisions of Art. XIV of the constitution of the State of Florida; (d) because said section is contrary to the provisions of section 16, Art. III of the constitution of the State of Florida

This motion was granted, and the alternative writ was quashed, and this judgment the relators have brought here for review by writ of error.

The other facts in the case are stated in the opinion of the court.

*Benj. S. Liddon* and *Wm. B. Farley,* for Plaintiffs in Error.

*M. D. Price,* for Defendants in Error.

40 S. C.

TAYLOR, C. J. (*after stating the facts.*)

Section 27, of Chapter 4684, laws enacted in 1899, to enforce the provisions of which this proceeding was instituted, provides as follows: "It shall be the duty of the board of county commissioners in each county in which there is a company or battery of State troops to provide each company or battery with an armory suitable for its meetings and drills and the safe storage of arms and equipments." The first contention of the motion to quash the alternative writ is that the provision of this section of the law is void because it violates the provisions of sections 5 of Article IX of the Florida constitution, which reads as follows: "The legislature shall authorize the several counties and incorporated cities or towns in the State to assess and impose taxes for county and municipal purposes, and for no other purposes, and all property shall be taxed upon the principles established for State taxation. But the cities and incorporated towns shall make their own assessments for municipal purposes upon the property within their limits. The legislature may also provide for levying a special capitation tax, and a tax on licenses. But the capitation tax shall not exceed one dollar a year, and shall be applied exclusively to common school purposes." The limitation imposed by this section of the organic law upon the legislature in its grants of authority to the counties to assess and impose taxes is, that such taxes must be for none other than *county purposes*. As the expense of building or renting armories for State troops must necessarily be met by taxation, it follows that the validity of a law imposing the burden of supplying such armories upon the counties must depend upon the question whether or not it is a *county*

*purpose.* And this brings us to the question, is a company of State troops, regularly enlisted as a part of the militia of the State, in any sort or sense such a county institution of the county where its members individually reside, as that the erection or maintenance of its armory in such county can properly be termed a county purpose?

Section 1 of Article XIV of our constitution provides as follows: "All able-bodied male inhabitants of the State between the ages of eighteen and forty-five years, that are citizens of the United States, or have declared their intention to become citizens thereof, shall constitute the militia of the State; but no male citizen of whatever religious creed or opinion shall be exempt from military duty except upon such conditions as may be prescribed by law." Section 2 of the same article provides that "the legislature may provide by law for organizing and disciplining the militia of the State, for the encouragement of volunteer corps, the safe keeping of the public arms, and for a guard for the State prison." Section 3 of the same Article provides for the appointment by the Governor, by and with the consent of the Senate, of two Major-Generals and four Brigadier-Generals of militia. Section 4 of the same Article provides that "the Governor shall have power to call out the militia to preserve the public peace, to execute the laws of the State, to suppress insurrections, or to repel invasion." Section 16 of Article IV of our constitution provides that "the Governor shall appoint all commissioned officers of the State militia, including an Adjutant General for the State. The Adjutant-General shall be the chief officer of the Governors staff, with the rank of Major-General. His duties and compensation shall be prescribed by law. Section

4 of Article IV of the constitution provides that "the Governor shall be Commander-in-Chief of the military forces of the State, except when they shall be called into the service of the United States."

From these provisions of our organic law it will be seen that that instrument recognizes and provides for the militia as a *State institution,* of which the chief executive of the State is made the commander-in-chief, and it is designated therein as being *"the militia of the State,"* and every able-bodied male inhabitant of the State, regardless of the county of his residence, between the ages of eighteen and forty-five years, who are citizens of the United States, or who have declared their intention to become citizens thereof, are made members thereof; and it is made the duty of the legislature to provide by law for the proper disciplination thereof; and, as part and parcel thereof, to encourage volunteer corps. The arms with which they are equipped are also recognized as being the public property of the State. The provisions of section 2 of said Article XIV, providing for the State militia, also seem to contemplate that the legislature may from the body of the militia of the State supply a guard for the State prison. If the State prison were fixedly established in any particular county and a company of State militia were organized in such county exclusively of residents thereof, and such company were assigned to duty as a guard for such State prison, there could be no question but that the expense of housing and maintenance of such guard would be properly chargeable to the State. And this duty of acting as a guard for the State prison seems to be contemplated by the constitution as being one of the functions of the militia of the State. Their other functions and duties are summarized in sec-

tion 4 of Article XIV above quoted as being  subject to
the call, not of a county or any local official, but *of the*
*Governor,* to preserve the public peace, to execute the
laws of the State, to suppress insurrection, or to  repel
invasion, not confinedly in any particular county or lo-
cality, but anywhere within the borders of the State.   In
a democratic form of government like ours the military ·
establishment may be said to be the *dernier resort* of gov-
ernmental authority, that is never called upon    except
when all other civil authority fails and becomes power-
less to preserve public order.   It is the strong arm of,
and represents the   might of governmental   sovereignty,
and is a power that should never be surrendered  to   an
*agency* of the State, such as a county   or   municipality,
but should be held, as our constitution seems to contem-
plate, subject to be wielded solely by the supreme   sov-
ereign arm of the State.   Said chapter 4684, laws of 1899,.
entitled "an act to provide for and encourage the organi-
zation of a corps of volunteer militia for service   as   a
land force," &c., provides that there shall be organized
in this State, for service as a land force, a body of militia
composed of such able-bodied males between the ages of
eighteen and forty-five, that are citizens of the United
States, as may volunteer and take the oath of enlistment.
It provides further that the    applicant   for   enlistment
shall be physically examined and shall take an oath of en-
listment, and the certificate of physical fitness and oath
of enlistment shall be forwarded promptly to the Adju-
tant General by the commander of the   organization   in
which the applicant enlists.   It provides further that the
body of the militia thus enlisting shall be known as the
"Florida State Troops," and shall be the first to be called
into service by the Commander-in-Chief to preserve   the

public peace, to execute the laws of this State, to suppress insurrection or to repel invasions, and shall be the first troops subject to any call of the President of the United States for the militia to execute the laws of the Union, suppress insurrections and repel invasions. Section 4 of the same act provides that the Governor shall be the commander-in-chief of such Florida State Troops, and shall appoint all commissioned officers thereof, including an Adjutant General, and all officers so appointed shall hold office for four years. Section 40 of said act provides that the State troops, or any portion thereof, when called out to aid the civil authorities, shall be considered for the time being in actual service, and shall be governed by such articles, rules and regulations as may be promulgated by the Adjutant General for the government and discipline of the State troops. Section 42 of said act provides that "When an invasion of, or insurrection in, the State is made or threatened, or whenever there exists a riot, mob, unlawful assembly, breach of the peace, or resistance to the execution of the laws of the State, or imminent danger thereof, and the civil authorities are unable to suppress the same, it shall be the duty of the commander-in-chief, or in case he can not be reached and the emergency will not admit of awaiting his orders, it shall be the duty of the Adjutant General to issue an order to the officer in command of the nearest body of State troops, commanding such officer to call out the troops under his command, and to proceed with all possible promptness to suppress the same." From this and the other provisions of law, statute and organic, referred to and quoted, it will be seen that the only duty or function that a body of State troops can be called upon, or are under any duty to perform, in any given

county, is dependent in such county upon the happening there of any of the extraordinary contingencies that justify resort to military force, and their duties and functions are not confined exclusively to the county where its individual members reside, but can be called into play in any other county of the State wherever the same contingency may arise. No body of the State militia, in other words, has any prescribed function or duty to perform exclusively in or for any particular county in the State, that it is not under equal obligation to perform in or for any other county of the State wherever the exigency may arise for its exercise. And whenever and wherever it is so called upon to act it is there as the representative of the State's supreme sovereignty, and not as that of the county in which it acts. The place of residence of its individual members has nothing whatever to do with fixing its status either as a State or county institution. The conclusion reached is that the militia of the State, and every part thereof, is essentially and necessarily a State institution, or rather an arm of the State government, resort to which can only be had upon the failure of all other governmental authority; and that it can be, and should be, in the very nature of things, wielded only by the supreme sovereign power of the State; that it is in no sense such a county institution or establishment as that any particular county can exclusively be either authorized or required to impose taxes for its, or any part of its, maintenance. It is essentially a State institution, taxation for the support and maintenance of whcih can be imposed only by the State, and when so imposed such taxation is required by section 1 of Article IX of our constitution to be at a *uniform and equal rate upon all the taxable property throughout the State,* and can not

for such purpose be confined to or burdened upon the property in any one county to the exclusion of any or all of the other counties of the State. Hubbard v. Fitzsimmons, 57 Ohio St. 436, 49 N. E. Rep. 477; Wasson v. Commissioners, 49 Ohio St. 622, 32 N. E. Rep. 472; Sanborn v. Commissioners of Rice County, 9 Minn. 273; Taylor McBean & Co. v. Chandler, 9 Heisk. (Tenn.) 349; Stetson v. Kempton, 13 Mass. 272; Hutchinson v. Ozark Land Co. 57 Ark. 554, 22 S. W. Rep. 173; Board of Commissioners of Jackson County v. State ex rel. Shields, 155 Ind 604, 58 N. E. Rep. 1037.

It follows from what has been said that section twenty-seven (27) of Chapter 4684, laws enacted in 1899, imposing the duty upon the board of county commissioners in each county in which there is a company or battery of State troops to provide each company or battery with an armory for its meetings and drills and the safe storage of its arms and equipments, violates the provisions of sections one and five of Article Nine of our constitution, and is, therefore, null and void.

The judgment of the court below is hereby affirmed at the cost of the plaintiffs in error.

CARTER, J., *concurring.*

I concur fully in the conclusion reached by the Chief-Justice, that a county can not be compelled under section 27, Chapter 4684, acts of 1899, to erect an armory for the use of a company of State troops organized therein. In reaching this conclusion I have given due weight to the legislative construction of the constitution of 1868, and that of 1885, as evidenced by the various acts of that body from 1868 up to the present time, imposing the duty

upon the several counties of providing armories for companies located therein; and I also recognize the rule that if the constitutionality of an act is doubtful, the doubt must be resolved in favor of the act. A careful consideration of the question has, however, convinced me that a proper construction of the constitution requires us to hold that the power does not reside in the legislature to compel a county to provide an armory under the circumstances of the present case. It may be admitted that the legislature possesses unlimited power over the counties, which are merely governmental agencies of the State, unless restrained by express or implied limitations in the constitution, and that to deny the power the court must find the limitation in that instrument. I am not prepared to say that most, if not all, "State purposes" are not also county purposes in a sense, but I think it would not be questioned that if the State Capitol, or a State prison, or the State Asylum, or Institution for the Blind and Deaf, or a State College or University, or any other State institution were located in a particular county, an act of the legislature requiring the county in which it was located, either alone or in conjunction with a number of other counties less than the whole, to pay for the erection or maintenance in whole or in part of such State institution would be unconstitutional, though it is apparent that such institution would in a sense be a county purpose, and would greatly enhance property values in and otherwise benefit the county where located. These and all other State institutions are properly and primarily "State purposes," to be erected and maintained from the State revenues, which must under sections 1 and 2, Article IX, be derived by means of a uniform and equal rate of taxation upon all the taxable property throughout the State, and

to require one or more counties to build or maintain them would clearly violate that constitutional rule of taxation, even though such institutions are in a sense county purposes and particular counties may derive special benefits from them. The State troops under the laws now in force is such a State institution; companies are organized in the several counties, without reference to the wishes or desires of such counties, by State militia officers and without reference to the necessities for military protection of the particular counties in which they are organized. The number of companies is limited to less than the number of counties in the State, and one county may have more than one company. The members of a company are not required to be citizens of the same county, nor are the companies organized or stationed in those counties only which need the police protection of the military. In a word, the law looks to the organization of a State force, for the protection of the entire State and every part thereof, and not of county forces for the protection of the counties. If the military is needed, the nearest company is called upon, but each company can be required to go to any part of the State when needed. Jackson county no doubt derives an incidental benfit from the fact that it has a military company within its borders—the mere presence of which tends to prevent lawlessness and to the security of the property of its citizens, but Calhoun, Washington, Holmes and other adjoining counties derive the same kind of benefit from the presence in Jackson county of such company, though in a less degree, yet they are not required to contribute to the expense of an armory for the use of such company. If Jackson county can be taxed to provide the armory, and in addition pay its share of the taxes required by the State

to enable the latter to pay other expenses incident to the maintenance of the company, while the other counties mentioned are required to contribute only to the general tax levied by the State, it is quite evident that the burdens laid upon those counties are much lighter than those laid upon Jackson county, and that, too, for a purpose in which all are interested and from which all derive a benefit. Sections 1 and 2, Article IX of the constitution, would be practically eliminated and without force if one or more counties could be compelled to assume the burdens incident to the maintenance of a State institution, in whole or in part, upon the theory that a mere incidental benefit accruing from the location of such institution within its or their borders would authorize the legislature to compel the counties to erect or maintain it, as being for county purposes. No doubt the location of the State Capitol at Tallahassee is beneficial in many ways to the people of that city and the county of Leon, and that it adds greatly to the welfare and prosperity of the city and county; but I apprehend it would not be maintained by any one that the legislature could compel that city or county to pay for the improvements now being made upon the Capitol. It may be that the legislature could authorize the county of Jackson through its proper officers to provide an armory for the use of the Jackson Guards, and that the county could voluntarily provide it under such power, but that question is not involved in this case, and I express no opinion in regard to it. It may be that if the civil authorities were unable to maintain law and order in the county without the aid of the military, the legislature could provide for organizing and stationing a company there and compel

the county to pay the expense thereof, or furnish an armory therefor, but that question is not involved, and I express no opinion as to that. The proposition in the present case is that the legislature can compel one county in the State to pay the expense of providing an armory for a State institution, to-wit: a company of State troops, that happens to be located therein, without reference to the needs of such county for military protection, or its consent to the imposition of such burden. I am satisfied no such power exists, and that the decision of the court below is correct.


MABRY, J. dissenting.


I do not concur in the conclusion and views of the court in this case. The sole question involved is the constitutionality of section 27 of the act of 1899, Chapter 4684, "to provide for and encourage the organization of a corps corps of volunteer militia for service as a land force, and to enforce the discipline therein," and to repeal certain prior laws on the subject.

The motion to quash the alternative writ is on the grounds that the section of the statute referred to is unconstitutional because in contravention of (a) section 5, Art. IX, (b) section 20 and 21, Art. III, (c) Art. XIV and (d) section 16 Art. III of the constitution of the State. After a reference to various provisions of the constitution the conclusion in the opinion prepared by the Chief-Justice is that the section of the statute referred to is in conflict with section 5, Art. IX of the constitution, though mention is made in connection therewith of section 1 of said Article. The view expressed by Mr. Justice CARTER, in agreeing to the conclusion reached, is that the

State of Florida ex rel. v. Dickenson et al.—Dissenting Opinion.

direct conflict of the designated section of the statute is
with section 1, Art. IX of the constitution.   I will make
no reference to sections 16, 20 and 21, Art. III, as it ap-
pears they have exerted no influence in   the   conclusion
reached.

The fifth section of Art. IX of the constitution provides,
in reference to county taxation, that the legislature shall
authorize the several counties in the State to assess and
impose taxes for county purposes, and for no other   pur-
poses.   The limitation contained in this section is on the
power of the legislature to authorize counties to levy taxes
for other than county purposes.   If the authorized tax is
for a county purpose, then there is no limitation so far as
this section is concerned.   The constitution does not un-
dertake to define what are "county purposes," and as said
by this court in Stockton v. Powell, 29 Fla. 1, 10 South.
Rep. 688, the authorities have formulated no generally ac-
cepted definition of such purposes, but leave each case in-
volving the question to be decided as it may . arise.   In
Cotten v. County Commissioners of Leon County, 6 Fla.
610, this court said in construing a   similar   constitu-
tional provision, "that the constitution does not attempt
to give a definition of the term 'county purpose,' and to
obtain a correct interpretation of that phrase we must
look to the contemporaneous legislation upon that subject
and the uniform action of the county courts under   the
territorial government."   And in Stockton v. Powell   it
is said, "in somewhat the same strain Judge Cooley   in
treating of what constitutes public   purposes for   which
taxation may be levied, says in his work on taxation (2nd
ed.) p. 116, that in deciding whether in a given case the
object for which the taxes are assessed is public or   pri-
vate, the courts must be governed mainly by the   course

and usage of the government, the objects for which taxes
have been customarily and by long course of legislation
levied, what objects or purposes have been considered nec-
essary to the support, and for the proper use of the gov-
ernment, whether State or municipal; that whatever law-
fully pertains to this, and is sanctioned by time and the
acquiescence of the people may well be held to belong to
the public use, and proper for the maintenance of good
government, though this may not be the only criterion of
rightful taxation." ' It was held in that case that the act
of the legislature authorizing Duval county to issue bonds
to improve the navigation of the St. Johns river was valid,
although the river was a navigable stream and public
highway running from its mouth in the county hundreds
of miles beyond its limits through other counties, and
commerce was carried on it from other States and for-
eign countries, and the commerce or business on the river
confined within the limits of Duval county was very small
and of no importance. The cases of Skinner v. Hender-
son, 26 Fla. 121, 7 South. Rep. 464, and County Commis-
sioners of Duval County v. City of Jacksonville, 36 Fla.
196, 18 South. Rep. 339, recognized the authority of the
legislature to direct the application of funds raised by
county taxation to objects that were embraced within the
terms "county purposes," though such objects might also
include in part other purposes. In the case of Cotten v.
County Commissioners, *supra*, it was held that neither the
locality of the work, nor the anticipated benefit is of itself
a certain test, but as furnishing a general rule the con-
currence of the two would seem to be required. The views
expressed in Nichol v. Mayor and Aledrman of Nashville,
9 Humph. 251, were approved, to the effect that the im-
provements must have some connection with the corpo-

rate town claiming them as a corporate purpose more direct than that which would result from the general increase of prosperity of the country by reason of such improvement made without a direct reference to or connection with the town.   In the case of Board of Commissioners of Hamilton County v. Mighels, 7 Ohio St. 109, a case characterized by Judge Dillon, as observed by this court in Stockton 1. Powell, as one in which the distinction between cities and towns, or municipal corporations proper, and involuntary *quasi* corporations, such as counties,  is very clearly drawn, it is said "a county organization is created almost exclusively with a view to the policy of the State at large for purposes of political   organization and civil administration in matters of finance, of education, of provision for the poor, of military organization, of the means of travel and transport, and especially  for general administration of justice.   With scarcely an exception all the powers and functions of the county organization have a direct and exclusive reference to the  general policy of the State, and are in fact but a branch of the general administration of that   policy."  The   word "county" signifies the same as *"shire"—county* being derived from the French, and *shire* from the Saxon.   Both these words signify a circuit or portion of the realm into which the whole land is divided for the better government thereof, and the more easy administration of justice."   I Bouv. Law Dictionary, Rawle's Revision, p. 450.   It  is the settled rule of constitutional construction   in   this court that if there is a reasonable doubt as to the constitutionality of an act of the legislature it should, in deference to the legislative judgment, be upheld, and this rule of construction should apply specially to a legislative declaration of what is a county purpose.   County Commis-

sioners of Duval County v. City of Jacksonville, *supra;* State *ex rel.* Turner v. Hocker, 36 Fla. 358, 18 South. Rep. 767. In view of these authorities and the past legislation in this State I do not think it should be held. that the section of the statute in question is in conflict with the fifth section of Art. IX of our constitution. The second section of Article XIV ordains that "the legislature may provide by law for organizing and disciplining the militia of the State, the encouragement of volunteer corps, the safe keeping of the public arms and for a guard for the State prison." All able bodied male inhabitants of the State between the ages of eighteen and forty-five years, that are citizens of the United States, or have declared their intention to become such, are constituted the militia of the State and subject to military duty. They are ascertained and enrolled by the county authorities in each county. The act of 1899, Chapter 4684, provides for a volunteer organization to consist of not more than two regiments of infantry of twelve companies each, and one battalion of artillery of four batteries of field artillery, to be known as the Florida State Troops. The organization under it is by the Commander-in-Chief and based in part upon the volunteer organizations existing under prior laws. Of the existing organizations, two regiments of three battalions each, one to contain four companies, and the others three companies each, were to be organized, and the additional companies provided for were to be added at such times as the Commander-in-Chief might deem advisable. At no time could the enrolled militia organize and become a part of the volunteer corps of State troops at will, but the organization and admission of a military company into such body have been under the control and direction of the Commander-

in-Chief. The policy of the State as evinced by the course
of action in reference to voluntary organizations is to en-
list companies in the populous districts of the State where
violence, riots and forcible resistance to the execution of
the laws are more liable to happen, and where there is .
the greatest need for an armed force. When an organ-
ized company has been accepted and duly admitted into
the body of State troops, it may be required to do service
in the preservation of the peace, the execution of the laws,
and the suppression of insurrections and invasions. The
forty-second section of the act provides that "when an
invasion of, or insurrection in, the State is made or
threatened, or whenever there exists a riot, mob, unlawful
assembly, breach of the peace, or resistance to the execu-
tion of the laws of the State, or imminent danger thereof,
and the civil authorities are unable to suppress the same,
it shall be the duty of the Commander-in-Chief, or in case
he can not be reached, and the emergency will not admit
of awaiting his orders, it shall be the duty of the Adjutant
General to issue an order to the officer in command of the
nearest body of State troops, commanding such officer to
call out the troops under his command and proceed with
all possible promptness to suppress the same." But it is
contended that such services are rendered for the State,
and the military organization rendering them being a part
of a State institution, the burden of maintaining and
supporting it devolves upon the State at large. If it be
conceded that the construction of local armories in coun-
ties for the use of volunteer companies therein is a
county as well as a State purpose (and clearly the sup-
pression of riots, mobs, the preservation of the peace, and
assistance in the execution of the laws subserve county

41 S. C.

organizations and purposes), there is nothing in section 5, Art. IX of the constitution to prevent county taxation to accomplish it.   The only limitation   therein is in   the power of the legislature to authorize county taxation for other than county purposes, and conceding such purpose the power exists.   If the building of local armories in the counties in which military companies exist is exclusively a State institution and one of the general charges of the State government for the maintenance  of  which  taxes should be imposed as equally as possible on all the property of the State, the prohibition against county taxation to build them is to be found in section one of the ninth article.   But I do not think that a local  armory  constructed by a county in its limits for the use of a volunteer military company domiciled therein is a State institution.   The provision held to be unconstitutional makes it the duty of the county commissioners of any county in which there is a military company of State troops to provide each company with an armory suitable for its meetings and drill and the safe storage of  its  arms.   This armory is for the use in the county by a company in aid of its efficiency for prompt and effective service, and  is not made the property of the State, or subject to the control of State authorities.   There is no purpose in the act to impose by county taxation the burden on the counties, as such, to maintain the organized militia of the State. All the expenses incident to such organization, including those of the stated encampments of the State troops, except the building of armories in the counties, are borne by the State at large.   For a period of thirty-five years the construction of such armories for use by  companies in the counties has been regarded by the legislature as a county purpose.   Almost contemporaneous with the con-

stitution of 1868, containing provisions as to military organizations similar to those found in the present revision, it was provided by the legislature that the county commissioners should provide at the cost of the counties suitable and safe armories for the volunteer companies within their respective limits. Section 20, Chap. 1638, Acts of 1868. From that time to the present similar provisions have been kept continually on our statute books. The existence of a voluntary company in a county has a direct contact and connection with it, and affords a special and more direct protection in case of emergency to the lives and property of its inhabitants than would be afforded by a company in another and possibly distant county. In view of this special benefit resulting to the counties in which companies are organized and exist, it would appear that there was ample basis for a legislative declaration that the construction of armories in a county for the use of companies therein was a county purpose. It is imminently proper and just that populous districts where lawlessness, riots, mobs and the resistance to the laws are more apt to occur, and which demand the existence of military organizations therein, should defary the expense of providing a storage room for the arms and a meeting place for the efficient training of the men who may be called on to render their special services. Matter of Bryant v. Palmer, 152 N. Y. 412, 46 N. E. Rep. 851.

If taxes can be authorized by the counties to erect such armories, it must be on the ground of a county purpose, and if it can be authorized as such it can be enforced as a duty. Decisions in Illinois, under constitutional provisions somewhat similar to those found in Art. IX of our constitution, hold that the legislature may authorize a municipality to levy the tax, but can not compel it to do

so. These decisions are referred to in the case of Potter v. County Commissioners of Dade County, decided at this term. It is also decided in that State that where the tax is authorized to accomplish an object which it is the duty of the municipality in the exercise of a governmental agency to carry out, the tax may be enforced. A county is specially an agency of the State in the administration of justice and the carrying out of the objects of government, and if the tax for armories can be permitted, it may be coerced as a duty properly imposed upon it.

The motion to quash did not question the alternative writ on the ground that the provision in reference to the construction of armories was in conflict with section 1, Article IX of the constitution, but if it did, I do not think the result would be different. That section directs that the legislature shall provide for a uniform and equal rate of taxation, which means that when a tax for State purposes is authorized it must be uniform and equal on all the property in the State, not exempt, and when it is authorized for a county or municipal purpose it must rest uniformly and equally upon all the taxable property in the county or municipality respectively. County Commissioners of Duval County v. City of Jacksonville, supra. If the construction of an armory is a county purpose, then the tax to pay for it must rest upon all the taxable property in the county. There is no suggestion in this case that such would not be the result if the county should be compelled to build the armory.

This is an outline of my views, without further discussion of the authorities, or a distinguishing of those cited in the opinion, which I think are not sufficient when properly applied to support the conclusion reached.