# Commonwealth, on Relation, etc. v. Sparks, County Judge, etc., et al.

(Decided November 16, 1923.)

## Appeal from Lawrence Circuit Court.

1. Counties—Power of Legislature Over Counties Varied and Extensive.—In the absence of constitutional restraint and limitation, the power of the legislature over the various counties composing the state is varied, as well as extensive, since they are only subdivisions of the state created for administrative and other purposes, and owe their creation to the state.

2. Militia—Exclusively a "State Institution."—Under Constitution, sections 219, 223, the organized state militia is purely and exclusively a state institution, and no part of it, nor any of the duties to be performed by it, partake in the least, exclusively or at all, of county purposes.

3. Evidence—Court Knows as Matter of History Taxes Raised by Counties up to Maximum Rate.—The court knows as a matter of history that in most of the counties the tax rate for the raising

of funds for the county treasury and for the purpose of discharging the governmental obligations of the county for other than school purposes is now fixed at the maximum rate of 50 cents on each $100 of assessable property, and that the revenue so produced is allotted by order of the fiscal court to the various county purposes.

4.  Constitutional Law—Construed to Harmonize Various Sections.—A Constitution should be so construed as to harmonize its various sections, and not to produce conflict between them.

5.  Taxation—Statute Requring Counties to Construct Armories Destroys Equality of Burdens.—Acts 1916, chapter 43, section 128, requiring counties, where militia organizations are organized, to construct and pay for armories, destroys the equality of burdens for state purposes, contrary to Constitution, section 171, and creates an unjustifiable discrimination unauthorized by it, notwithstanding sections 219-223, authorizing the organization of the militia, especially in view of sections 157, 158, placing a limit on county taxation.

6.  Militia—Approval by County Judge of Organization of Militia Company and Construction of Armory does Not Bind County.—Because Acts 1916, chapter 43, section 10, provides that application for organization of a militia company is required to be approved by a county judge, the county through him does not thereby obligate itself to perform the statutory requirement as to construction of an armory upon his approval, as such a construction of the statute would substitute the county judge as a fiscal court when Constitution, section 144, provides who shall constitute it.

CHAS. I. DAWSON, Attorney General, and MARTIN T. KELLY, Assistant Attorney General, for appellant.

W. J. ROBERTS and CLYDE L. MILLER for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At its 1916 session, the General Assembly of the Commonwealth enacted chapter 43, Acts of that year, page 436, which related to the state militia. The act was a complete law upon the subject and contained 142 sections, and is now chapter 86 of the present Kentucky Statutes. The organized militia is designated in the act as the "Kentucky National Guard." Section 10 of the act provides that an application to organize a unit of the national guard before it is acted on shall be approved by the county judge of the county in which the proposed unit is to be organized. Its section 128 says: "Where militia organizations have been, or may hereafter be, organized in any county of this state, the fiscal court or corresponding body of said county shall provide and maintain at

the cost of the county, an armory, which shall consist of a suitable hall for assembly and drill or other exercises, and suitable rooms annexed thereto for the meetings of the command, or commands, for administrative work, and for the storage and safekeeping of public property; and which shall be at all times accessible to the local commanding officer of the militia and to those who may be authorized by him. Said fiscal court, or corresponding body, shall provide and maintain at the cost of the county, for every such armory, the necessary heating apparatus, fuel, improved modern lights for illumination, water plumbing, telephone service and repairs; and it shall be the duty of the attorney general to institute proceedings against any county that fails to provide and maintain an armory as provided by this section. The adjutant general shall be the sole judge as to deciding on the fulfillment of the requirements of this section, and his decision shall be final.''

After the passage of the act and in February, 1920, a military unit was organized in Lawrence county pursuant to its provisions, following which the fiscal court of the county provided a duly equipped armory in obedience to what was supposed to be its duties under the section. That fiscal court was succeeded by the present one, and it conceived the idea that section 128 of the act was unconstitutional, and it voted an order directing the county attorney of the county to take possession of the armory and equipment and to sell it pursuant to terms therein specified, and while that officer was preparing to carry out the order this equity action was filed by the Commonwealth on relation of its attorney general, as directed in the section (128) against the fiscal court, its members and the county attorney to enjoin the latter from executing the order and to enjoin the fiscal court from requiring him to do so. The petition fully set out the facts with reference to the organization of the unit and referred to the law applicable thereto, as well as to section 128 imposing the duties upon the counties therein specified, and the court sustained the demurrer filed to it by the defendants. Plaintiff declined to plead further, resulting in a dismissal of the petition, and to reverse that judgment plaintiff prosecutes this appeal.

In the absence of constitutional restraint and limitation the power of the legislature over the various counties composing the state is varied as well as extensive, since

they are only "subdivisions of the state, created for administrative and other purposes and owe their creation to the state." 7 R. C. L. 926-7. Indeed, the unrestrained power of the legislature over county affairs has sometimes been designated by no less a comprehensive term than the "omnipotence of the General Assembly;" hence, in Ruling Case Law, *supra*, on page 927, the text says: "Aside from the Constitution and the organic law of a state the legislature is not limited in the right to control the counties, in as much as these are merely agencies of the state." Since, however, this case may be disposed of in the light of express and manifestly implied terms of our Constitution, we will refrain from further reference to the common law concerning the power of the legislature to enact the particular statute involved.

It will be of service at the beginning of the discussion to note that an organized state militia by whatever name called is strictly a state institution and performs exclusively a state service. Indeed, it is the organized power of the country and may be considered the state's muscular arm with which, as a last resort, judgments and administrative orders necessary for the perpetuation and preservation of our civilized form of government are enforced. 27 Cyc. 505, 18 R. C. L. 1057. The latter citation says: "It may be laid down as a generally accepted rule that the organized militia of the states is a state institution—a (state) government agency. It is so recognized by the various Constitutions;" and in the reference to Cyc., the text under the head of "Expense and Maintenance" (of the state militia) says: "The cost of maintaining and training the militia is primarily a state charge." Supporting that quotation the case of Sweeney v. Commonwealth, 118 Ky. 912, is cited in the note. Other cases are People v. Swigert, 107 Ill. 494; State v. Anderson, 52 N. J. L. 150, and Worth v. Craven County, 118 N. C. 112. Aside from the section making the Governor the commander-in-chief of the organized state militia, our constitutional provisions upon the subject are contained in sections 219-223, inclusive, of that instrument. The pertinent one to the question involved here is section 220, which in part says: "The General Assembly shall provide for maintaining an organized militia." We take it, therefore, that the authorities, *supra*, as well as our Constitution, indisputably establishes that our organized state militia is purely and exclusively a state institution,

and if so no part of it nor any of the duties to be performed by it partake in the least exclusively or at all of county purposes. But the latter question has not escaped the attention of the courts.

In the case of Hubbard v. Fitzsimmons, 57 Ohio St. Rep. 436, the court had before it almost the exact question we have here, which was the right of the state to impose upon a county the duty to construct and maintain an armory for a unit of the state militia. The Constitution of that state had a provision in it, in substance, the same as section 171 of our Constitution, which was section 2 of article XII of its Constitution. After holding that the militia was purely a state organization and performing exclusively a state purpose, the court, quoting from Daniel v. City of Columbus, 53 Ohio St. Rep. 658, said: "The expenses incident to the performance of a duty of this general character cannot be made the subject of a local imposition. . . . The purpose to be accomplished by this expenditure is common to the state at large; and the taxes by which it is to be met must, in obedience to the requirement of section 2 of article XII of the Constitution, be levied by a uniform rule upon all the taxable property within the state." There are other cases from the same court to the same effect.

In the case of State of Florida v. Dickenson, 44 Fla. 623, 60 L. R. A. 539, 1 Ann Cas. 122, the same question that we have here was before the supreme court of the state of Florida. Section 5 of article 9 of the Constitution of that state was substantially the same as sections 181 and 181a of our Constitution. The legislature passed a law similar to section 128 of the act of 1916, *supra*, and it was sought therein to require the fiscal authorities of Jackson county in that state to comply with the provisions of the act. The court held that the statute was unconstitutional because the state militia was purely a state institution and no part of its maintenance could be considered for local or county purposes, and that to sustain the statute would violate that section of the state's Constituion. Section 2 of article 14 of the Constitution of that state was practically the same as section 220 of our Constitution, and at the end of the discussion the court thus summed up its conclusions: "It follows from what has been said that section twenty-seven (27) of chapter 4684, laws enacted in 1899 (same as section 128, Acts 1916), imposing the duty upon

the board of county commissioners in each county in which there is a company or battery of state troops to provide each company or battery with an armory for its meetings and drills and the safe storage of its arms and equipments, violates the provisions of sections one and five of article IX, of our Constitution, and is, therefore, null and void.'' To the same effect is the case of Knapp v. Kansas City, 48 Mo. App. 485.

The only case cited by the Commonwealth directly dealing with the question is Hodgdon v. Haverhill, 193 Mass. 406, but a reading of that opinion will show that it is not in point. In the first place neither the statute nor the involved sections of the Constitution of Massachusetts are set out in the opinion, and we are therefore unable to determine the similarity, if any, between them and those involved in this case. But, assuming that the constitutional provisions were substantially the same, the statute involved, as it appears in the opinion required the municipality to construct the armory and for the state to rent it for a sufficient length of time to remunerate the municipality for the cost of its construction, which at most was an indirect method of forcing the municipality to lend to the state the cost price of the armory and to accept payment on terms provided therein. However, the obligation to only that extent was not arbitrarily imposed on the municipality, but only after it had been voted by the city council, which was its fiscal body.

Another case which we have found is that of Bryant v. Palmer, 152 N. Y. 412. The statute involved in that case imposed only a part of the cost price of the armory upon the municipality. The opinion was delivered in 1897, and under prior Constitutions of the state its Court of Appeals held that it was competent for the legislature to impose such burdens upon local taxing units, and the new Constitution was adopted in 1894, after the rendition of those opinions without a material change with reference to the maintenance of the state militia. The only added clause in the new Constitution was: ''And it shall be the duty of the legislature at each session to make sufficient appropriations for the maintenance thereof'' (the militia). In upholding the statute under these circumstances, the court said:

''It would be a strained and unnatural construction to hold that the plain, simple language of this constitu-

tional amendment was intended to reverse the wise policy of the state that has been acted upon for fifty years, and which is founded on considerations approved by the lawmaking power during that entire period.

"It is only reasonable that those great centers of population that are subject to the dangers of riot and disorder, and are liable to the citizens for property lost in consequence, should have a large number of the armories located within their limits for proper protection, and it is but just that by reason of these great advantages enjoyed certain counties should pay, as they do, a sum estimated to be in excess of half a million dollars a year of the aggregate sum necessary to maintain the militia."

It will thus be seen that the opinion was made to turn, not only upon former opinions of the court under a Constitution which it was held that the new one did not materially alter, but also upon recited local exclusive benefits to the taxing unit upon which the statute put the burden, and to make the doctrine of that opinion applicable to the case at bar, even if we should concede its reasoning to be sound, it should appear that Lawrence county, or any other county in the Commonwealth which might be involved, received some exclusive local benefits from the location of the military company within its boundaries over other counties of the state, but which fact we know to be untrue, since the militia serves all the counties of the state alike and the local community does not receive even the remote and incidental special benefit of an increase in its population because of the organization of the company (the members already being localized to the place) nor on any other account, which fact was the controlling one in most of the cases relied on by counsel for plaintiff, which are: Hendrickson, County Judge v. Taylor County Farm Bureau, 196 Ky. 75; Lang, Judge v. Commonwealth, 190 Ky. 29; Prowse v. Board of Education of Christian County, 134 Ky. 365; McDonald v. City of Louisville, 113 Ky. 425; Hopkins County v. St. Bernard Coal Co., 114 Ky. 153, and Fayette County v. Board of Education, 23 Ky. L. R. 389.

An examination of the opinions in those cases will clearly show that they do not reach the point involved in this one. Some of them dealt with a public purpose concerning which there was no constitutional expressed or necessarily implied mandate; while others, particularly the Fayette county case, involved questions con-

cerning the public school system.  The contention there
was between the city of Lexington and Fayette county
and was not one between the Commonwealth and a county
and it pertained to the payment of election officers for
holding a school election in the city of Lexington, which
is a part of the county of Fayette.  The same question
of public schools was involved in the Prowse case, and it
will be noted that the Constitution fixes no limit of taxa-
tion for such purposes, either by the state or subdivis-
ions thereof.  Furthermore, the *direct* benefit flowing
from the public purpose involved (schools) was reaped
by the local taxing unit, other portions of the state re-
ceiving only an indirect benefit therefrom, which is the
exact reverse of the situation in this case.  In the Mc-
Donald case the matters involved pertain to purely local
purposes, as was also true in the Hopkins county case.
In the Lang case the question was whether, under the
Constitution and statutes enacted pursuant thereto, a
county could be required to contribute the sum of one
hundred dollars per annum toward the maintenance of
*its* inmates of the house of reform for youthful criminals
not convicted of a felony and delinquent children, who
were placed therein under judgments of the county juve-
nile court.  In upholding the right of the state by statute
to require such contribution in order to that extent reim-
burse the state for its maintenance of the house of re-
form, the opinion said: ''There could be no discrimina-
tion between the counties, as each would bear a burden
in proportion to the benefits it would receive from the
correction and training of its citizens.''  The implica-
tion is that if there was an *absence* of direct local bene-
fits there *would* be a discrimination between the counties
and the statute would be invalid.  But, beyond that, the
county, in being forced to comply with the statute therein
involved, was doing nothing more than contributing to-
ward the reformation and social improvement of its
local youths so as to make better citizens of them in the
future, and it was thus discharging a permissible local
governmental function or county purpose.  The same is
true as to the Hendrickson case, which involved a pub-
lic measure that instead of operating upon the class of
delinquent youths of the county was for the improvement
and benefit of the agricultural interests of the county;
the state and other counties therein in both instances
receiving only an indirect benefit.  Besides, as we have

previously observed, in the latter case the question was one not affected by any constitutional provision.

Independently of any of the foregoing, we may further add that if section 220 of our Constitution permits the legislature to impose the duties here involved upon a county where a military company may be organized, then it may *mandatorily* do so, as indeed was done under section 128, *supra*, of the 1916 Acts, with no escape by the county from the performance of the burden. Section 157 of the Constitution limits the rate of taxation of counties, except for school purposes, to fifty cents on each one hundred dollars of assessed property (with certain exceptions not here involved), and provides that no county shall become indebted in any manner or for any purpose in any one year exceeding the revenue provided for that year, which we have held in numerous cases to mean the revenue that might be collected by a levy of the maximum rate. There is no escape from the mandatory provisions of that section except by election as is provided by section 158 of that instrument. We know as a matter of history, that in most of the counties (but whether so or not they have the power to do so) the tax rate, for the raising of funds for the county treasury and for the purpose of discharging the governmental obligations of the county for other than school purposes, is now fixed at the maximum rate of fifty cents on each one hundred dollars' worth of assessable property; and further, that the revenue so produced is allotted by order of the fiscal court to the various county purposes. A county in that condition might have organized in it a military company if as many as fifty of its young men were sufficiently patriotic to do so, and the statute under consideration would immediately create an additional indebtedness exceeding the revenue provided for that year and requiring, in order to meet it, an additional levy beyond the constitutional limit. It surely was never contemplated by the framers of the Constitution that the operation of any of its sections should be brought into such an irreconciliable conflict, for in the instance we have supposed, what, may we ask, would be the duty of the fiscal authorities of the county? Should they abandon some of the public purposes to provide for which the maximum levy was made and which, in all probability, had already been undertaken; or should they decline to meet the obligation imposed by the statute now under discussion? Each obliga-

tion was necessarily incurred under legislative authority, and we know of no rule by which one would supersede or take precedence of the other.  We are also reminded that if the legislature could impose the burden here involved upon a county wherein a military unit is organized, it could with equal propriety impose it exclusively upon the incorporated city or town in which the company was organized and located, since there are no greater inhibitions in the Constitution against the latter than are found therein against the former, and great indeed would be the hardship borne by the inhabitants of the municipality if the latter policy should be adopted.

The rule is that a Constitution should be construed so as to harmonize its various sections and not so as to produce conflict between them.  In the light of the authorities, *supra,* which are reenforced by the persuasive factors above enumerated, our conclusions are (1), that under our Constitution the state militia is essentially and exclusively a state institution with no single county, including those in which any of its units may be organized, receiving therefrom any special local benefits, and that the purpose of the militia is in no sense a county one; (2), that to uphold the contested provisions of the statute would destroy the equality of burdens for state purposes contrary to the theory of our Constitution, and create an unjustifiable discrimination unauthorized by it and supported by no corresponding benefits.

But it is insisted that because the application for the organiaztion of the company is required to be approved by the county judge, the county, through him, thereby obligates itself to perform the statutory requirements upon his endorsing his approval.  But such a construction would substitute the county judge as a fiscal court, when section 144 of the Constitution provides who shall constitute it.  Besides, under a former statute containing a similar provision, this court in the case of Haley, Adjutant General v. Cochran, 31 Ky. L. R. 505, 102 S. W. 852, held that "The provision as to the certificate of the county judge is merely directory, it being for the information of the Governor, and to enable him to judge whether or not the applicants should be enlisted as soldiers."

It is furthermore contended that this court in effect sustained the constitutionality of a statute similar to the one here involved in the case of Fiscal Court of Jefferson

County v. Pflanz, 127 Ky. 8. The question there involved was whether the expense of lighting, heating and for janitor's service for the armony in Jefferson county should be borne by the fiscal court of that county or should be performed by the jailer as a part of the duties attached to his office. There was no statute *expressly* requiring the county to pay for them and under the then statute defining the duties of the jailer it was held that it was not his duty to perform the service, but that under the *necessarily implied* provisions of the statute then existing relating to armories it was the duty of the fiscal court to do so. No question of the constitutionality of the statute was raised or discussed by either litigant, but on the contrary its validity was tacitly assumed and the court so treated it. We do not, therefore, regard the opinion as a guiding, much less binding, precedent.

Upon the whole case we find no valid reason for disturbing the judgment, and it is accordingly affirmed.

Whole court sitting.